## MILLS ET AL. *v.* ROGERS ET AL.

No. 80–1417.   Argued January 13, 1982—Decided June 18, 1982

Powell, J., delivered the opinion for a unanimous Court.

*Stephen Schultz* argued the cause for petitioners. With him on the briefs was *Francis X. Bellotti*, Attorney General of Massachusetts.

*Richard Cole* argued the cause for respondents. With him on the brief was *Robert Burdick*.*

---

*Briefs of *amici curiae* urging reversal were filed by *Paul L. Perito* and *C. Frederick Ryland* for the American College of Neuropsychopharmacology; by *Joel I. Klein* and *H. Bartow Farr III* for the American Psychiatric Association; and by *Robert H. Weber* and *Jonathan Brant* for the Mental Health Legal Advisors Committee.

Briefs of *amici curiae* urging affirmance were filed by *Joseph R. Tafelski* for Advocates for Basic Legal Equality, Inc.; by *Paul R. Friedman, Jane Bloom Yohalem, John Townsend Rich*, and *Donald N. Bersoff* for the American Psychological Association et al.; and by *William Alsup* for Barbara Jamison et al.

*Louis M. Aucoin III* filed a brief for Patients' Rights Advocacy Services, Inc., as *amicus curiae*.

JUSTICE POWELL delivered the opinion of the Court.

The Court granted certiorari in this case to determine whether involuntarily committed mental patients have a constitutional right to refuse treatment with antipsychotic drugs.

I

This litigation began on April 27, 1975, when respondent Rubie Rogers and six other persons filed suit against various officials and staff of the May and Austin Units of the Boston State Hospital. The plaintiffs all were present or former mental patients at the institution. During their period of institutionalization all had been forced to accept unwanted treatment with antipsychotic drugs.[1] Alleging that forcible

---

[1] As used in this litigation, the term "antipsychotic drugs" refers to medications such as Thorazine, Mellaril, Prolixin, and Haldol that are used in treating psychoses, especially schizophrenia. See Rogers v. Okin, 478 F. Supp. 1342, 1359–1360 (Mass. 1979), aff'd in part and rev'd in part, 634 F. 2d 650, 653 (CA1 1980). Sometimes called "major tranquilizers," these compounds were introduced into psychiatry in the early 1950's. See Cole & Davis, Antipsychotic Drugs, in 2 A. Freedman, H. Kaplan, & B. Sadock, Comprehensive Textbook of Psychiatry II, pp. 1921–1922 (2d ed. 1975). It is not disputed that such drugs are "mind-altering." Their effectiveness resides in their capacity to achieve such effects. Citing authorities, petitioners assert that such drugs are essential not only to the treatment of individual disorders, but also to the preservation of institutional order generally needed for effective therapy. See Brief for Petitioners 17–41, 54–100. Respondents dispute this claim, also with support from medical authorities. Respondents also emphasize that antipsychotic drugs carry a significant risk of adverse side effects. These include such neurological syndromes as parkinsonisms, characterized by a mask-like face, retarded volitional movements, and tremors; akathisia, a clinical term for restlessness; dystonic reactions, including grimacing and muscle spasms; and tardive dyskinesia, a disease characterized in its mild form by involuntary muscle movements, especially around the mouth. Tardive dyskinesia can be even more disabling in its most severe forms. See Rogers v. Okin, 478 F. Supp., at 1360; Byck, Drugs and the Treatment of Psychiatric Disorders, in L. Goodman & A. Gilman, The Pharmalogical Basis of Therapeutics 152, 169 (5th ed. 1975).

administration of these drugs violated rights protected by the Constitution of the United States, the plaintiffs—respondents here—sought compensatory and punitive damages and injunctive relief.[2]

The District Court certified the case as a class action. See *Rogers* v. *Okin*, 478 F. Supp. 1342, 1352, n. 1 (Mass. 1979). Although denying relief in damages, the court held that mental patients enjoy constitutionally protected liberty and privacy interests in deciding for themselves whether to submit to drug therapy.[3] The District Court found that an involuntary "commitment" provides no basis for an inference of legal "incompetency" to make this decision under Massachusetts law. *Id.*, at 1361–1362.[4] Until a judicial finding of

---

[2] The respondents also presented constitutional and statutory challenges to a hospital policy of secluding patients against their will. 478 F. Supp., at 1352. Their complaint additionally asserted claims for damages under state tort law. *Id.*, at 1352, 1383. The District Court held that state law prevented seclusion except where necessary to prevent violence. See *id.*, at 1371, 1374. Neither this decision, nor the denial of relief on the damages claims, is in issue before this Court.

[3] The District Court characterized liberty to make "the intimate decision as to whether to accept or refuse [antipsychotic] medication" as "basic to any right of privacy" and therefore protected by the Constitution. See *id.*, at 1366. The court did not derive this right from any particular constitutional provision, although it did observe that the "concept of a right of privacy . . . embodies First Amendment concerns." *Ibid.* In relying on the First Amendment the court reasoned that "the power to produce ideas is fundamental to our cherished right to communicate and is entitled to comparable constitutional protection." *Id.*, at 1367.

[4] Under the common law of torts, the right to refuse any medical treatment emerged from the doctrines of trespass and battery, which were applied to unauthorized touchings by a physician. See, *e. g.*, *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 738–739, 370 N. E. 2d 417, 424 (1977); W. Prosser, Law of Torts § 18 (4th ed. 1971). In this case the petitioners had argued—as they continue to argue—that the judicial commitment proceedings conducted under Massachusetts law, Mass. Gen. Laws Ann., ch. 123 (West Supp. 1982–1983), provide a determination of incompetency sufficient to warrant the State in providing treatment over the objections of the patient. In rejecting this argument

incompetency has been made, the court concluded, the wishes of the patients generally must be respected. *Id.*, at 1365–1368. Even when a state court has rendered a determination of incompetency, the District Court found that the patient's right to make treatment decisions is not forfeited, but must be exercised on his behalf by a court-appointed guardian. *Id.*, at 1364. Without consent either by the patient or his guardian, the court held, the patient's liberty interests may be overridden only in an emergency.[5]

The Court of Appeals for the First Circuit affirmed in part and reversed in part. *Rogers* v. *Okin*, 634 F. 2d 650 (1980). It agreed that mental patients have a constitutionally protected interest in deciding for themselves whether to undergo treatment with antipsychotic drugs. *Id.*, at 653.[6] It

---

as a matter of state law, the District Court relied principally on the language of the relevant Massachusetts statutes and on the regulations of the Department of Mental Health. See 478 F. Supp., at 1359, 1361 (citing Department of Mental Health Regulation § 221.02 ("No person shall be deprived of the right to manage his affairs . . . solely by reason of his admission or commitment to a facility except where there has been an adjudication that such person is incompetent"), and Mass. Gen. Laws Ann., ch. 123, § 25 (West Supp. 1982–1983) ("No person shall be deemed to be incompetent to manage his affairs . . . solely by reason of his admission or commitment in any capacity . . .")). The court also appears to have engaged in independent factfinding leading to the same conclusion: "The weight of the evidence persuades this court that, although committed mental patients do suffer at least some impairment of their relationship to reality, most are able to appreciate the benefits, risks, and discomfort that may reasonably be expected from receiving psychotropic medication." 478 F. Supp., at 1361.

[5] The District Court defined an emergency as a situation in which failure to medicate "would result in a substantial likelihood of physical harm to th[e] patient, other patients, or to staff members of the institution." *Id.*, at 1365.

[6] The Court of Appeals termed it "intuitively obvious" that "a person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs." 634 F. 2d, at 653. Although the Court of Appeals found that the "precise textual source in the Constitution for the protection of this inter-

also accepted the trial court's conclusion that Massachusetts law recognizes involuntarily committed persons as presumptively competent to assert this interest on their own behalf. See *id.*, at 657–659. The Court of Appeals reached different conclusions, however, as to the circumstances under which state interests might override the liberty interests of the patient.

The Court of Appeals found that the State has two interests that must be weighed against the liberty interests asserted by the patient: a police power interest in maintaining order within the institution and in preventing violence, see *id.*, at 655, and a *parens patriae* interest in alleviating the sufferings of mental illness and in providing effective treatment, see *id.*, at 657. The court held that the State, under its police powers, may administer medication forcibly only upon a determination that "the need to prevent violence in a particular situation outweighs the possibility of harm to the medicated individual" and that "reasonable alternatives to the administration of antipsychotics [have been] ruled out." *Id.*, at 656. Criticizing the District Court for imposing what it regarded as a more rigid standard, the Court of Appeals held that a hospital's professional staff must have substantial discretion in deciding when an impending emergency requires involuntary medication.[7] The Court of Appeals reserved to the District Court, on remand, the task of developing mechanisms to ensure that staff decisions under the

---

est is unclear," *ibid.*, it concluded that "a source in the Due Process Clause of the Fourteenth Amendment for the protection of this interest exists, most likely as part of the penumbral right to privacy, bodily integrity, or personal security." *Ibid.* The Court of Appeals found it unnecessary to examine the conclusion of the District Court that First Amendment interests also were implicated.

[7] The Court of Appeals held that the District Court had erred in requiring what it construed as an overly simplistic mathematical calculation of the "quantitative" likelihood of harm. See *id.*, at 656.

"police power" standard accord adequate procedural protection to "the interests of the patients."[8]

With respect to the State's *parens patriae* powers, the Court of Appeals accepted the District Court's state-law distinction between patients who have and patients who have not been adjudicated incompetent. Where a patient has not been found judicially to be "incompetent" to make treatment decisions under Massachusetts law,[9] the court ruled that the *parens patriae* interest will justify involuntary medication only when necessary to prevent further deterioration in the patient's mental health. See *id.*, at 660. The Court of Appeals reversed the District Court's conclusion that a guardian must be appointed to make nonemergency treatment decisions on behalf of incompetent patients. Even for incompetent patients, however, it ruled that the State's *parens patriae* interest would justify prescription only of such treatment as would be accepted voluntarily by "the individual himself . . . were he competent" to decide. *Id.*, at 661.[10]

---

[8] It asserted, apparently as a minimum, that "the determination that medication is necessary must be made by a qualified physician as to each individual patient to be medicated." *Ibid.*

[9] A number of other States also distinguish between the standards governing involuntary commitment and those applying to determinations of incompetency to make treatment decisions. For a survey as of December 1, 1977, see Plotkin, Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment, 72 Nw. U. L. Rev. 461, 504–525 (1977). The Court of Appeals for the Second Circuit has held that civil commitment does not raise even a presumption of incompetence. See *Winters* v. *Miller*, 446 F. 2d 65 (1971).

[10] In imposing this "substituted judgment" standard the Court of Appeals appears to have viewed its holding as mandated by the Federal Constitution. See 634 F. 2d, at 661 ("In so holding, we *do not* imply that the Constitution . . ."). But it followed its ultimate substantive conclusion with a citation to a Massachusetts case: "*Cf. Superintendent of Belchertown* v. *Saikewicz*," 373 Mass. 728, 370 N. E. 2d 417 (1977). *Saikewicz* held that a court must apply the "substituted judgment" standard in determining whether to approve painful medical treatment for a profoundly retarded

The Court of Appeals held that the patient's interest in avoiding undesired drug treatment generally must be protected procedurally by a judicial determination of "incompetency."[11] If such a determination were made, further on-the-scene procedures still would be required before antipsychotic drugs could be administered forcibly in a particular instance. *Ibid.*[12]

Because the judgment of the Court of Appeals involved constitutional issues of potentially broad significance,[13] we granted certiorari. *Okin* v. *Rogers*, 451 U. S. 906 (1981).

## II

## A

The principal question on which we granted certiorari is whether an involuntarily committed mental patient has a constitutional right to refuse treatment with antipsychotic

---

man incapable of giving informed consent. In *Saikewicz* the Massachusetts Supreme Judicial Court appears to have relied on both the Federal Constitution and the law of Massachusetts to support its decision. See *id.*, at 738–741, 370 N. E. 2d, at 424–425. But the Massachusetts court characterized its analysis as having identified a "constitutional right of privacy," *id.*, at 739, 370 N. E. 2d, at 424, thus creating some doubt as to the extent that the decision had an independent state-law basis.

[11] The Court of Appeals appears to have agreed with the District Court that this determination, under Massachusetts law, would require a decision by the probate court under Mass. Gen. Laws Ann., ch. 123, § 25 (West Supp. 1982–1983); see ch. 201, §§ 1, 6, 12 (West Supp. 1982–1983) (appointment and powers of guardians). It suggested, however, that nonjudicial procedures would satisfy the federal constitutional requirements of due process. See 634 F. 2d, at 659–660.

[12] The Court of Appeals again instructed the District Court to develop procedural safeguards adequate to protect the patient's substantive interests. See *id.*, at 661.

[13] Constitutional questions involving the rights of committed mental patients to refuse antipsychotic drugs have been presented in other recent cases, including *Rennie* v. *Klein*, 653 F. 2d 836 (CA3 1981), and *Davis* v. *Hubbard*, 506 F. Supp. 915 (ND Ohio 1980). On the issues raised, see generally Plotkin, *supra;* Shapiro, Legislating the Control of Behavior Control: Autonomy and the Coercive Use of Organic Therapies, 47 S. Cal. L. Rev. 237 (1974).

drugs.[14]   This question has both substantive and procedural aspects.   See 634 F. 2d, at 656, 661; *Rennie* v. *Klein*, 653 F. 2d 836, 841 (CA3 1981).   The parties agree that the Constitution recognizes a liberty interest in avoiding the unwanted administration of antipsychotic drugs.[15]   Assuming that they are correct in this respect, the substantive issue involves a definition of that protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it.   See *Youngberg* v. *Romeo*, *post*, at 319–320; *Bell* v. *Wolfish*, 441 U. S. 520, 560 (1979); *Roe* v. *Wade*, 410 U. S. 113, 147–154 (1973); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 25–27 (1905).   The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance.   See *Parham* v. *J. R.*, 442 U. S. 584, 606 (1979); *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976).

As a practical matter both the substantive and procedural issues are intertwined with questions of state law.   In theory a court might be able to define the scope of a patient's federally protected liberty interest without reference to state law.[16]   Having done so, it then might proceed to adjudicate the procedural protection required by the Due Process Clause for the federal interest alone.   Cf. *Vitek* v. *Jones*, 445

---

[14] Pet. for Cert. 1.

[15] In this Court petitioners appear to concede that involuntarily committed mental patients have a constitutional interest in freedom from bodily invasion, see Brief for Petitioners 43–47, but they deny that this interest is "fundamental."   They also assert that it is outweighed in an appropriate balancing test by compelling state interests in administering antipsychotic drugs.   *Id.*, at 54–68.

[16] As do the parties, we assume for purposes of this discussion that involuntarily committed mental patients do retain liberty interests protected directly by the Constitution, cf. *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), and that these interests are implicated by the involuntary administration of antipsychotic drugs.   Only "assuming" the existence of such interests, we of course intimate no view as to the weight of such interests in comparison with possible countervailing state interests.

U. S. 480, 491–494 (1980). For purposes of determining actual rights and obligations, however, questions of state law cannot be avoided. Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution. See *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 7, 12 (1979); *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975); see also Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). If so, the broader state protections would define the actual substantive rights possessed by a person living within that State.

Where a State creates liberty interests broader than those protected directly by the Federal Constitution, the procedures mandated to protect the federal substantive interests also might fail to determine the actual procedural rights and duties of persons within the State. Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, see, *e. g., Vitek* v. *Jones, supra,* at 488; *Greenholtz* v. *Nebraska Penal Inmates, supra,* at 7, the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law. Moreover, a State may confer *procedural* protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State.

## B

Roughly five months after the Court of Appeals decided this case, and shortly after this Court granted certiorari, the Supreme Judicial Court of Massachusetts announced its deci-

sion in *Guardianship of Roe*, 383 Mass. 415, 421 N. E. 2d 40 (1981) *(Roe)*.  *Roe* involved the right of a noninstitutionalized but mentally incompetent person to refuse treatment with antipsychotic drugs.  Expressly resting its decision on the common law of Massachusetts as well as on the Federal Constitution,[17] Massachusetts' highest court held in *Roe* that a person has a protected liberty interest in "'decid[ing] for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs.'"  *Id.*, at 433, n. 9, 421 N. E. 2d, at 51, n. 9.[18]  The court found—again apparently on the basis of the common law of Massachusetts as well as the Constitution of the United States—that this interest of the individual is of such importance that it can be overcome only by "an overwhelming State interest."  *Id.*, at 434, 421 N. E. 2d, at 51.  *Roe* further held that a person does not forfeit his protected liberty interest by virtue of becoming incompetent, but rather remains entitled to have his "substituted judgment" exercised on his behalf.  *Ibid.*  Defining this "substituted judgment" as one for which "[n]o medical expertise is required," *id.*, at 435, 421 N. E. 2d, at 52, the Massachusetts Supreme Judicial Court required a *judicial* determination of substituted judgment before drugs

---

[17] See 383 Mass., at 417, and n. 1, 433, n. 9, 421 N. E. 2d, at 42, and n. 1, 51, n. 9.

[18] Although the Massachusetts court quoted this formulation from the decision of the Court of Appeals in *Rogers* v. *Okin*, 634 F. 2d, at 653, the quotation is used to define the right, rather than to identify its legal source.  *Roe* noted that *Rogers* v. *Okin* found the source of this right in the Due Process Clause of the Fourteenth Amendment.  The court continued its discussion by stating its reliance on three bases, two of them not cited in *Rogers* v. *Okin:* the "inherent power of the court to prevent mistakes or abuses by guardians, whose authority comes from the Commonwealth," and the "common law" right of persons to decide what will be done with their bodies.  383 Mass., at 433, n. 9, 421 N. E. 2d, at 51, n. 9.

could be administered in a particular instance,[19] except possibly in cases of medical emergency.[20]

## C

The Massachusetts Supreme Court stated that its decision was limited to cases involving *noninstitutionalized* mental patients. See *id.*, at 417, 441, 452–453, 421 N. E. 2d, at 42, 55, 61–62.[21] Nonetheless, respondents have argued in

---

[19] See *id.*, at 435, 421 N. E. 2d, at 52:

"The determination of what the incompetent individual would do if competent will probe the incompetent individual's values and preferences, and such an inquiry, in a case involving antipsychotic drugs [and a noninstitutionalized but incompetent patient], is best made in courts of competent jurisdiction."

Having held that a "ward possesses but is incapable of exercising personally" the right to refuse antipsychotic drugs, the Massachusetts Supreme Court viewed the "primary dispute" as over "who ought to exercise this right on behalf of the ward." *Id.*, at 433, 421 N. E. 2d, at 51. The Supreme Judicial Court in *Roe* identified six "relevant" but "not exclusive" factors that should guide the decisions of the lower courts: "(1) the ward's expressed preferences regarding treatment; (2) his religious beliefs; (3) the impact upon the ward's family; (4) the probability of adverse side effects; (5) the consequences if treatment is refused; and (6) the prognosis with treatment." *Id.*, at 444, 421 N. E. 2d, at 57. It emphasized that the determination "must 'give the fullest possible expression to the character and circumstances'" of the individual patient and that "this is a subjective rather than an objective determination." *Id.*, at 444, 421 N. E. 2d, at 56 (citation and footnote omitted).

[20] See *id.*, at 440–441, 421 N. E. 2d, at 54–55.

[21] But cf. *id.*, at 432, 421 N. E. 2d, at 50 ("because of the likelihood of . . . the necessity of making similar determinations in other cases, we establish guidelines regarding the criteria to be used and the procedures to be followed in making a substituted judgment determination"), and *id.*, at 453–454, 421 N. E. 2d, at 62 ("We do not mean to imply that these [involuntarily committed] patients' rights are wholly unprotected or that their circumstances are entirely dissimilar to those we have discussed. We do suggest, however, that it would be imprudent to establish prematurely the relative importance of adverse interests . . .").

this Court that *Roe* may influence the correct disposition of the case at hand.[22]   We agree.

Especially in the wake of *Roe*, it is distinctly possible that Massachusetts recognizes liberty interests of persons adjudged incompetent that are broader than those protected directly by the Constitution of the United States.   Compare *Roe, supra*, at 434, 421 N. E. 2d, at 51 (protected liberty interest in avoiding unwanted treatment continues even when a person becomes incompetent and creates a right of incompetents to have their "substituted judgment" determined), with *Addington* v. *Texas*, 441 U. S. 418, 429–430 (1979) (because a person "who is suffering from a debilitating mental illness" is not "wholly at liberty," and because the complexities of psychiatric diagnosis "render certainties virtually beyond reach," "practical considerations" may require "a compromise between what it is possible to prove and what protects the rights of the individual").   If the state interest is broader, the *substantive* protection that the Constitution affords against the involuntary administration of antipsychotic drugs would not determine the actual substantive rights and duties of persons in the State of Massachusetts.

Procedurally, it also is quite possible that a Massachusetts court, as a matter of state law, would require greater protection of relevant liberty interests than the minimum adequate to survive scrutiny under the Due Process Clause.   Compare *Roe, supra*, at 434, 421 N. E. 2d, at 51 ("We have . . . stated our preference for judicial resolution of certain legal issues arising from proposed extraordinary medical treatment . . ."), with *Youngberg* v. *Romeo, post*, at 322–323 ("[T]here certainly is no reason to think judges or juries are better

---

[22] Respondents first presented this argument in a motion to dismiss or in the alternative to certify certain questions to the Supreme Judicial Court of Massachusetts, filed in this Court on October 1, 1981.   In their brief on the merits, respondents argue that *Roe* provides an alternative basis on which this Court could affirm the judgment of the Court of Appeals.

qualified than appropriate professionals in making [treatment] decisions"), and with *Parham* v. *J. R.*, 442 U. S., at 608, n. 16 (Courts must not "unduly burde[n] the legitimate efforts of the states to deal with difficult social problems. The judicial model for factfinding for all constitutionally protected interests, regardless of their nature, can turn rational decisionmaking into an unmanageable enterprise").[23] Again on this hypothesis state law would be dispositive of the procedural rights and duties of the parties to this case.

Finally, even if state procedural law itself remains unchanged by *Roe*, the federally mandated procedures will depend on the nature and weight of the *state* interests, as well as the individual interests, that are asserted. To identify the nature and scope of state interests that are to be balanced against an individual's liberty interests, this Court may look to state law. See, *e. g., Roe* v. *Wade*, 410 U. S., at 148, and n. 42, 151, and nn. 48–50; *Ingraham* v. *Wright*, 430 U. S. 651, 661–663 (1977). Here we view the underlying state-law predicate for weighing asserted state interests as being put into doubt, if not altered, by *Roe*.[24]

## D

It is unclear on the record presented whether respondents, in the District Court, did or did not argue the existence of "substantive" state-law liberty interests as a basis for their

---

[23] Even prior to *Roe*, the Court of Appeals concluded that Massachusetts state law, which it construed as requiring *judicial* determinations of incompetency separate from involuntary commitment proceedings, see 634 F. 2d, at 658–659, "in many respects . . . goes well beyond the minimum requirements mandated by the Fourteenth Amendment," *id.*, at 659 (footnote omitted). *Roe* now has taken the further step of requiring *judicial* procedure in every instance in which a guardian believes drug therapy necessary for a noninstitutionalized incompetent.

[24] In *Roe* the Massachusetts court explicitly considered the implicated state interests, see 383 Mass., at 449, 421 N. E. 2d, at 59, and concluded that the trial judge had erred in finding that the State had a "vital" *parens patriae* interest in "seeing that its residents function at the maximum level of their capacity," *ibid.* The Court of Appeals in this case had found and weighed a *parens patriae* interest. 634 F. 2d, at 657–661.

claim to procedural protection under the federal Due Process Clause, or whether they may have claimed state-law procedural protections for substantive federal interests.[25]   In their brief in this Court, however, respondents clearly assert state-law arguments as alternative grounds for affirming both the "substantive" and "procedural" decisions of the Court of Appeals.   See Brief for Respondents, especially at 61, 71–72, 92–95.

Until certain questions have been answered, we think it would be inappropriate for us to attempt to weigh or even to identify relevant liberty interests that might be derived directly from the Constitution, independently of state law.   It is this Court's settled policy to avoid unnecessary decisions of constitutional issues.   See, *e. g.*, *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 294 (1982); *New York Transit Authority* v. *Beazer*, 440 U. S. 568, 582–583, n. 22 (1979); *Poe* v. *Ullman*, 367 U. S. 497, 502–509 (1961); *Ashwander* v. *TVA*, 297 U. S. 288, 341, 347–348 (1936) (Brandeis, J., concurring).   This policy is supported, although not always required, by the prohibition against advisory opinions. Cf. *United States* v. *Hastings*, 296 U. S. 188, 193 (1935) (review of one basis for a decision supported by another basis not subject to examination would represent "an expression of an abstract opinion").

---

[25] Although relying primarily on federal constitutional grounds, the respondents' original complaint in the District Court could be construed as raising state-law guarantees either as alternative or as interrelated bases for relief.   See Complaint in No. 75–1610–T (D. Mass.) (filed Apr. 27, 1975).   In their briefs in the Court of Appeals, respondents relied unambiguously on state law in support of both the "substantive" and "procedural" rights that they now claim in this Court.   See Brief for Plaintiff-Appellants in No. 79–1649, p. 44 ("Massachusetts law created a legal entitlement to be free from forced medications except in emergencies . . ."); Brief for Plaintiff-Appellees in No. 79–1648, p. 54 ("[T]he lower court's requirement that a guardian must decide whether an incompetent patient will receive psychotropic medication in a non-emergency was the correct application of state law and was not based upon constitutional authority") (emphasis omitted).

In applying this policy of restraint, we are uncertain here which if any constitutional issues now must be decided to resolve the controversy between the parties. In the wake of *Roe*, we cannot say with confidence that adjudication based solely on identification of federal constitutional interests would determine the actual rights and duties of the parties before us. And, as an additional cause for hesitation, our reading of the opinion of the Court of Appeals has left us in doubt as to the extent to which state issues were argued below and the degree to which the court's holdings may rest on subsequently altered state-law foundations.

Because of its greater familiarity both with the record and with Massachusetts law, the Court of Appeals is better situated than we to determine how *Roe* may have changed the law of Massachusetts and how any changes may affect this case. Accordingly, we think it appropriate for the Court of Appeals to determine in the first instance whether *Roe* requires revision of its holdings or whether it may call for the certification of potentially dispositive state-law questions to the Supreme Judicial Court of Massachusetts, see *Bellotti* v. *Baird*, 428 U. S. 132, 150–151 (1976).[26] The Court of Appeals also may consider whether this is a case in which abstention now is appropriate. See generally *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 813–819 (1976).

The judgment of the Court of Appeals is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[26] A certification procedure is provided by Mass. Rules of Court, Sup. Jud. Ct. Rule 1:03.