# IN THE SUPREME COURT OF IOWA

No. 21 / 05-0845

Filed August 17, 2007

**ROBERT SWANSON,**

　　Appellant,

vs.

**CIVIL COMMITMENT UNIT FOR SEX OFFENDERS
(CCUSO) and IOWA DEPARTMENT OF HUMAN SERVICES,**

　　Appellees.

---

　　Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

　　A patient in the civil commitment unit for sex offenders appeals a decision dismissing his petition for judicial review. **AFFIRMED**.

　　Mark C. Smith, State Appellate Defender, and Matthew S. Sheeley, Assistant Public Defender, for appellant.

　　Thomas J. Miller, Attorney General, and Mark Hunacek, Deputy Attorney General, for appellees.

**WIGGINS, Justice.**

In this appeal, Robert Swanson, a patient in the Civil Commitment Unit for Sexual Offenders (CCUSO), seeks a ruling that the district court erred in denying his petition for judicial review. He claims he meets the definition of an "aggrieved person" under Iowa Code chapter 17A (2003) and that to deny him a contested case hearing violates his due process rights. Because we agree with the district court that Swanson is not an aggrieved person under chapter 17A and to deny him a contested case hearing does not violate his due process rights, we affirm the judgment of the district court dismissing his petition for judicial review.

## I. Background Facts and Proceedings.

The Iowa department of human services (DHS) operates CCUSO. DHS presently houses Swanson in CCUSO's facility. CCUSO "was created by the 1998 Sexually Violent Predators Act of Iowa to provide secure, inpatient treatment for sexual offenders who are believed to be a high risk for sexually reoffending." Iowa Dep't of Human Servs., Civil Commitment Unit for Sexual Offenders, http://www.dhs.state.ia.us/dhs_organization/other/civil_commitment.html (2000) (last visited Aug. 14, 2007) [hereinafter *DHS, CCUSO*].

Patients who are housed at the CCUSO facility are civilly committed under Iowa's Sexually Violent Predator Act, chapter 229A of the Iowa Code. The Iowa legislature amended chapter 229A in 2002 directing DHS to "adopt rules pursuant to chapter 17A necessary to administer this chapter." Iowa Code § 229A.15B (2003). Currently, DHS has not promulgated any rules. Instead, CCUSO developed a "Patient Handbook and Orientation Manual." The handbook provides the rules and policies of CCUSO.

The handbook begins by explaining the mission and overview of the program. The mission of CCUSO is "to provide treatment for persons involuntarily committed to [CCUSO's] care as sexual offenders who are deemed likely to reoffend. Treatment is the key objective of this program." CCUSO patients "are afforded the same rights as other civilly committed patients." The handbook presents CCUSO patients with twenty-four separate and distinct rights. Some of these rights are:

- the rights of full citizenship except as may be specifically limited by the constitution or statute;

- the right to file application for a writ of habeas corpus and the right to petition the court for release; and

- the right to an attorney and to judicial review of the hospitalization.

According to DHS, "[t]he program is structured to provide intrinsic incentives to motivate cooperation with treatment programming." *DHS, CCUSO.* In order to accomplish this goal, the handbook states CCUSO created a phase system which "recognize[s] patients' progress in the program and [ ] provide[s] further motivation to cooperate with program activities."

The handbook explains the five phases of the program. Each phase adheres to a general time line of progression from one phase to the next. The first phase is the assessment and observation phase. The handbook describes this phase as the time patients and program staff have an opportunity to become acquainted and to develop a clear understanding about program expectations and rules. A patient is able to move to phase two once the patient has demonstrated a stable and cooperative behavioral pattern and completes each of the following requirements: (1) completion of all psychological testing; (2) admission of some sexual offense or completion

of a clean polygraph; (3) completion of relaxation training and basic cognitive skills training; (4) orientation to the program and completion of the patient handbook; (5) thirty days of good behavior free from any major infractions; and (6) signing a phase two contract with request for placement in phase two.

In the second phase, the patient enters the core phase. The patient participates in a minimum one-year curriculum of psycho-educational groups. These groups are designed to teach concepts and skills that are fundamental to learning to control sexual impulses. In order to advance to level three, the patient must pass an oral or written exam over the curriculum and complete the following requirements: (1) satisfactory completion of four quarters of psycho-educational classes; (2) pass polygraph exams concerning minor victims, adult victims, and paraphilias; (3) freedom from major behavioral reports and close supervision for ninety days; (4) no ratings lower than three on the last ninety-day review; and (5) signing a phase three contract and submitting a written request for placement in phase three.

In the third phase, the patient enters the advanced phase. In this phase, the patient will work on applying the principles and concepts learned in phase two and achieving the goals established in an individualized treatment plan. Basic requirements for advancement are: (1) no ratings lower than five on the last ninety-day review; (2) absence of any major behavioral reports for the last four months; (3) completion of specific offense polygraphs, if requested; (4) development of an individualized treatment plan; (5) completion of victim sheets and victim letters; and (6) signing a phase four contract and submitting a written request for placement in phase four.

If the patient advances from phase three, the patient enters phase four, the honor phase. This phase requires the patient to demonstrate a high level of cooperation, insight, motivation, and application of the basic principles taught in the program. The patient is expected to model appropriate behavior and be able to function as a peer facilitator or leader in group discussion. In order to move to the fifth phase, the patient must meet the following requirements: (1) no ratings less than eight on the last ninety-day review; (2) absence of any major behavioral reports for the last six months; (3) completion of a detailed relapse prevention plan; (4) successful completion of a polygraph exam regarding recent sexual fantasies and behaviors; (5) demonstration of good sexual control and nondeviant sexual responses and absence of problematic sexual behavior for one year; (6) submission of a written request for phase five placement and signing the phase five contract; and (7) placement in a transitional living facility by the committing court.

Finally, the patient enters the fifth phase, the transition phase. Here, the patient is gradually given increasing opportunities to live in less restrictive settings. The patient is monitored closely, assessed clinically, and provided support as the patient takes on increasing responsibility for the patient's own care. A patient is recommended to the court for final release from the program only after meeting the following requirements: (1) demonstrate the establishment of a strong social support network; (2) successfully maintain employment, or participation in a volunteer program if retired or unable to work, for at least one year; (3) demonstrate adequate financial support; (4) maintain contact with transitional counselors for two years; (5) fulfill all requirements included in the patient's release contract for at least two years; (6) submit to and pass all random

physiological assessments requested by the transitional counselors; and (7) complete a final discharge interview with the CCUSO staff and be recommended for release.

As one of many disciplinary procedures, CCUSO created a level system to provide rewards and increasing privileges to patients who participate in the treatment program and remain free of behavioral problems. The expectation of the CCUSO program is that patients who avoid behavioral reports and suspensions will advance rapidly to level four. As the level increases, so does the extent of the privileges. For example, a patient on level one may only make emergency phone calls and is only allowed legal visits without the prior approval of the director or his designee. In contrast, a patient who has advanced to level four is allowed unrestricted phone calls, except during treatment times, and contact visits twice a week with no approval specified.

In order for a patient to move from level one to level two, the patient must maintain seven consecutive days of good behavior, free of rule violations and suspensions. To move from level two to level three, the patient must maintain fourteen continuous days of good behavior, free of all unit rule infractions and suspensions. To move from level three to level four, the patient must maintain sixty days of continuous good behavior, free of infractions and suspensions.

CCUSO has three levels of behavior rule violations: minor, major, and felony. Minor violations include such things as violation of property, meal, medication, mail, clothing, or phone rules set out in the handbook. Major violations include such things as disobeying an order, disrespect, theft, misuse of property, disruptive behavior, debt incurrence, or harassment.

Finally, felony infractions include assault, battery, sexual assault, escape or attempted escape, possession of dangerous contraband, or arson.

The handbook explains to the patient how violations are assessed and appealed. It states:

> Violations of program rules can result in a suspension of level privileges, a loss of canteen allowance, loss of privileges due to placement in a lower level in the program, or other behavioral consequences depending upon the violation. The decision regarding such consequences will depend upon the type of violation but will generally be made by the Behavioral Investigator in accordance with CCUSO policies and procedures. . . . Rule violations will generally result in a suspension of level privileges by being restricted to your room for 2 to 8 hours without receiving a behavioral report. Treatment Program Supervisors reserve the right to increase or decrease sanctions imposed by staff as the facts and circumstances warrant it. Continuing behavior problems can result in additional sanctions, up to and including placement in seclusion. . . . The Investigator will gather the relevant facts and make a decision regarding any consequences deemed appropriate. *Such decisions may be appealed to the CCUSO Director or a designee, by the completion of a written appeal that summarizes the basis for the appeal within 3 days of the report. The appeal will be answered in writing by the Director or a designee within ten working days of the decision unless the need for a continuance of the final decision is documented prior to the expiration of the ten working-day period.*

Further, patients have access to grievance procedures. A patient first is to attempt to resolve any concerns about mistreatment with the individual CCUSO staff who the patient feels acted wrongly. If the resolution is not satisfactory to the patient, a written grievance can be submitted to the supervisor. If this is unsatisfactory, the patient can submit a detailed written grievance to the director or director's designee who will make a decision within three weeks of receiving it. There is no further appeal, but the handbook provides the patient may take the complaint to the courts if the patient so chooses.

From May 8 to November 19, 2003, Swanson was the subject of four behavioral reports for rule violations. Swanson appealed three behavioral reports to DHS. He claimed his due process rights were violated and requested that the department provide him with a contested case hearing.

The State filed motions to dismiss all three of Swanson's appeals. The State claimed there was no basis under either Iowa Code chapter 17A, Iowa Administrative Code 441–chapter 7, or Iowa Administrative Code 481–chapter 10 to grant Swanson a contested case hearing.[1] Swanson resisted the motions to dismiss.

The administrative law judge issued three identical proposed decisions dismissing each of Swanson's requests for a contested case hearing. In each proposed decision the administrative law judge found the "[h]andbook [does] not expressly provide a CCUSO patient, after exhausting internal review procedures, with the right to appeal a behavioral report and disciplinary consequences pursuant to Iowa Code Chapter 17A or 441 IAC Chapter 7." The administrative law judge further found Swanson was not an aggrieved person as contemplated by Iowa Administrative Code chapter 441. However, the administrative law judge recognized he had no authority to determine whether "by not providing [Swanson] with a contested case proceeding, [Swanson] is being denied due process" and preserved this issue for judicial review.

In all three cases Swanson requested review of the administrative law judge's proposed decision. In response to this request, DHS adopted the

---

[1]After the commencement of this appeal, on May 12, 2004, DHS amended Iowa Administrative Code rule 441–7.5(2)(*a*)(17) to state "[a] hearing shall *not* be granted when: [t]he appeal involves patient treatment interventions outlined in the patient handbook of the civil commitment unit for sexual offenders." Iowa Admin. Code r. 441–7.5(2)(*a*)(17) (emphasis added).

proposed decision of the administrative law judge as its final decision in all three cases.

Swanson petitioned for judicial review of the agency's decision and for equitable and declaratory relief. Relevant to this appeal Swanson claims, contrary to the administrative law judge's findings, he is an aggrieved person for purposes of Iowa Administrative Code rule 441–7.1(9) and DHS's action in denying his request for a contested case hearing violates his due process rights.

The district court affirmed the decision of the agency and dismissed the petition for judicial review. The district court held Swanson was not entitled to a contested case hearing because he was not an aggrieved person as defined by Iowa Administrative Code rule 441–7.1(9). The court also ruled Swanson's due process rights were not violated when he was denied a contested case hearing.

Swanson appeals the decision of the district court to our court.

**II. Issues.**

Swanson raises two issues on appeal. First, whether Swanson is an aggrieved person for purposes of contested case review under Iowa Administrative Code rule 441–7.1(9). Second, whether the denial of his request for a contested case hearing violates his due process rights.

**III. Scope of Review.**

Swanson claims the district court's dismissal of his judicial review petition was an error of law because the agency's action is reviewable under the judicial review provisions of Iowa Code chapter 17A. Therefore, our review of this claim is for correction of errors at law. *Lewis Central Educ. Ass'n v. Iowa Bd. of Educ. Exam'rs,* 625 N.W.2d 687, 689 (Iowa 2001).

Additionally, Swanson has raised and preserved constitutional issues relating to the denial of a contested case hearing. This court reviews constitutional issues raised in an agency proceeding de novo. *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 605 (Iowa 2004). Under Iowa Code section 17A.19(10)(*a*) this court can grant relief from agency action if we determine a person's substantial rights have been prejudiced because the agency's action is unconstitutional on its face or as applied. Iowa Code § 17A.19(10)(*a*). This court will not give any deference to the agency's view of the constitutionality of its statute or rule because this is exclusively within the role of the judiciary. *ABC Disposal Sys., Inc.*, 681 N.W.2d at 605 (citing Iowa Code § 17A.19(11)(*b*)).

### IV. Analysis.

*A. Whether Swanson is an aggrieved person for purposes of a contested case review.* Iowa Code section 17A.19(1) states: "A person or party who has exhausted all adequate administrative remedies and who is aggrieved or adversely affected by any final agency action is entitled to judicial review thereof under this chapter." Iowa Code § 17A.19(1). In its rules, DHS defined "aggrieved person" as:

> [A] person against whom the department has taken an adverse action. This includes a person who meets any of the following conditions:
>
> . . .
>
> 9. For mental health and developmental disabilities, a person:
>
> • Whose application for statement payment program benefits or state community mental health or mental retardation service funds has been denied or has not been acted upon in a timely manner.

• Who has been notified that there will be a reduction or cancellation of state payment program benefits or state community mental health or mental retardation service funds.

*Individuals and providers that are not listed above may meet the definition of an aggrieved person if the department has taken an adverse action against that individual or provider.*

Iowa Admin. Code r. 441–7.1(9) (emphasis added).

Neither party contends that DHS's interpretation of "aggrieved person" is contrary to section 17A.19(1) or that Swanson does not suffer from a mental disability as required by the rule.

We will assume for the purposes of this decision, that DHS's issuance and investigation of the behavioral reports and the sanctions that follow, are agency action. Therefore, the question we must decide is whether the behavioral reports were adverse to or aggrieved Swanson. If so, Swanson is entitled to a contested case hearing.

Swanson argues he is aggrieved because the long-term consequence of the major behavioral reports is a delay in his progression from one treatment phase to another. Moreover, the reports become part of a permanent record while he is in the treatment program. We disagree that Swanson is aggrieved.

One of the goals of Iowa Code chapter 229A is to provide treatment to a person placed in CCUSO. *In re Detention of Betsworth*, 711 N.W.2d 280, 288-89 (Iowa 2006). The handbook states the treatment used by the CCUSO staff is based on the cognitive-behavioral model. The goal of the treatment is to change a patient's behavior so the patient no longer suffers from a mental abnormality, which makes the person likely to engage in predatory acts constituting sexually violent offenses. Successful treatment allows for the patient's safe release or placement in a transitional program. Iowa Code § 229A.8. To achieve this treatment goal, the program consists

of a series of phases. The patient is rewarded with advancement from phase to phase by completing all the requirements of each phase.

A patient's progress through each phase can be lengthened if the patient fails to meet a goal of the phase or has behavioral problems. There is no set time in which a person is expected to complete the program. Chapter 229A does not require as a prerequisite to entering CCUSO that the treatment will be successful. *In re Detention of Darling,* 712 N.W.2d 98, 101 (Iowa 2006). If a patient does not follow the steps required in each phase or continually has behavioral problems, the patient will not progress through the phases. The failure of a person to progress because of the issuance of a major behavioral report is not an adverse action, but an integral part of the treatment under a cognitive-behavioral model. *See Youngberg v. Romeo*, 457 U.S. 307, 324-25, 102 S. Ct. 2452, 2463, 73 L. Ed. 2d 28, 43 (1982) (holding "administrators [of a state mental institution], and particularly professional personnel, should not be required to make each decision [regarding the care of a patient] in the shadow of an action for damages").

Consequently, Swanson is not an aggrieved person for purposes of contested case review under Iowa Administrative Code rule 441–7.1(9).

*B. Whether the denial of Swanson's request for a contested case hearing violates his due process rights.* Swanson claims the denial of a judicial review proceeding violates his due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and article one, section nine of the Iowa Constitution. He argues the major behavioral reports he received necessarily lengthened the duration of his involuntary commitment at CCUSO. Swanson argues this practice violates due process because it denies him and other CCUSO residents meaningful access to an impartial tribunal.

The Due Process Clause of the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Although we have traditionally considered the federal and state due process provisions to be equal in scope, import, and purpose in deciding these constitutional issues, interpretations of the federal Due Process Clause are not binding on us when we are called upon to determine the constitutionality of Iowa statutes challenged under our own due process clause. *Callender v. Skiles*, 591 N.W.2d 182, 187 (Iowa 1999). However, our discussion of the Due Process Clause of the Fourteenth Amendment is equally applicable to Swanson's Iowa constitutional claim because Swanson has not given us any reason to interpret the federal and Iowa due process clauses differently. *State v. Bower*, 725 N.W.2d 435, 441 (Iowa 2006).

*1. Substantive due process.*

Swanson claims he is being denied his fundamental right to access the courts. The right to access the courts typically concerns the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 342-43, 83 S. Ct. 792, 795-96, 9 L. Ed. 2d 799, 804 (1963), the right to state-provided transcripts for indigent persons, *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S. Ct. 585, 590-91, 100 L. Ed. 891, 899 (1956), the right to file for divorce without the obligation of filing fees for indigent persons, *Boddie v. Connecticut*, 401 U.S. 371, 380-81, 91 S. Ct. 780, 787, 28 L. Ed. 2d 113, 120-21 (1971), and prisoners' rights to have adequate libraries and trained assistance, *Bounds v. Smith*, 430 U.S. 817, 828, 97 S. Ct. 1491, 1498, 52 L. Ed. 2d 72, 83 (1977). In order to proceed under a substantive due process analysis concerning the right to access the courts, Swanson must specify a constitutionally required avenue that he has been denied. Swanson only

argues he has been denied access to the courts because he has been denied proper procedure. Accordingly, we can only consider his procedural due process arguments.

### 2. *Procedural due process.*

"When a state action threatens to deprive a person of a protected liberty or property interest, a person is entitled to procedural due process." *Meyer v. Jones,* 696 N.W.2d 611, 614 (Iowa 2005). To determine what process is due a person who has been deprived of a protected liberty or property interest we have adopted the test set out by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18, 33 (1976). *See State ex rel. Hamilton v. Snodgrass,* 325 N.W.2d 740, 742 (Iowa 1982) (adopting and implementing the *Mathews* balancing test). In *Mathews* the Court held in order to determine what the "specific dictates of due process generally requires," the court must consider three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335, 96 S. Ct. at 903, 47 L. Ed. 2d at 33.

We have found "no constitutional bar to the civil confinement of sexually violent predators with untreatable conditions when confinement is necessary to protect the public." *In re Detention of Darling,* 712 N.W.2d at 101. However, those who are involuntarily committed retain a liberty interest in the requirements and procedures of chapter 229A. *See In re M.T.,* 625 N.W.2d 702, 706 (Iowa 2001) (finding a person's "liberty interests

are at stake at an involuntary commitment hearing," and "[t]herefore it is imperative that the statutory requirements and procedures be followed."). Further, as the State concedes, the Supreme Court found the State has

> a duty to provide adequate food, shelter, clothing, and medical care. . . . [This is because a patient involuntarily committed in a state institution] enjoys [the] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.

*Youngberg*, 457 U.S. at 324, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42-43. However, the Constitution only requires us to make certain that professional judgment was in fact exercised. We are not required, nor is it appropriate for us to specify which of several professionally acceptable choices should have been made. Finally, "a State may confer procedural protections of liberty interests that extend beyond those minimally required by the Constitution of the United States." *Mills v. Rogers*, 457 U.S. 291, 300, 102 S. Ct. 2442, 2449, 73 L. Ed. 2d 16, 23 (1982).

In considering the first factor of *Mathews*, the private interest that will be affected by the official action, Swanson argues "the handbook creates a liberty interest because it confers patients with the right to complete the treatment program within a minimum time frame—a time frame that is automatically extended upon receipt of a major behavioral report." As previously discussed in this decision, the handbook does not create a minimum or maximum time frame for release from the treatment program. The handbook merely sets forth certain behaviors Swanson must achieve before he can graduate from the program. The time in which to complete the program is wholly dependant on the progress made by Swanson. Accordingly, Swanson has not identified a liberty interest beyond those discussed in *Youngberg*.

Under the second factor, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, is de minimis. The handbook provides Swanson with appropriate procedural safeguards. The handbook gives a patient the right to appeal a behavioral report. A behavioral report is investigated and the director, without a documented need for a continuance, must decide the appeal within ten working days of the appeal. Further, the patient has access to grievance procedures if he is dissatisfied with the appeals process or any other matter. If the resolution of the grievance is not satisfactory, the patient can submit a detailed written grievance to the director or director's designee who will make a decision within three weeks of receiving the written grievance. There is no further appeal of a grievance, but the handbook provides that a patient may take the complaint to the courts if the patient so chooses. These procedural safeguards ensure that there is a low risk of an erroneous deprivation of a patient's liberty interest to "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Youngberg*, 457 U.S. at 324, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42-43. In fact, during one of Swanson's appeals the investigator dismissed Swanson's misuse of property charge even though he fashioned a paper clip into a tool which was approximately four inches long, with a one-inch curved hook.

As to the third factor, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, it would be too costly for DHS to conduct judicial review hearings on every behavioral report. In this case alone, three contested case proceedings would be

required with the possibility of judicial and appellate review of the contested cases. Not only would these proceedings be costly financially, they would interrupt Swanson's treatment while the proceedings work through the court system.

Consequently, applying the *Mathews* factors we find no additional process is necessary to satisfy Swanson's procedural due process rights under the federal and state constitutions.

## V. Disposition.

Because Swanson is not an aggrieved person under chapter 17A and his due process rights were not violated when he was denied a contested case hearing, we affirm the judgment of the district court dismissing his petition for judicial review.

**AFFIRMED.**

All justices concur except Appel, J., who concurs specially.

#21/05-0845, *Swanson v. Civil Commitment Unit*

**APPEL, J. (specially concurring).**

I specially concur in the outcome of this case. I write separately because I believe the majority applies the wrong legal framework to resolve the issue presented in this appeal.

In his petition, Swanson seeks judicial review of a final agency action, which held that he was not entitled to a contested case hearing in connection with disciplinary matters under the applicable administrative procedures. He desires an evidentiary hearing before the agency to determine the validity of the underlying discipline.

These claims were brought under the Iowa Administrative Procedures Act (IAPA). When a party seeks review of final agency action under the IAPA, two separate and distinct questions arise. The first question is whether the party seeking judicial review is "aggrieved" under the IAPA. The second question involves a judicial determination of the type of agency action involved, specifically, whether the matter involves a contested case proceeding or whether the matter involves "other agency action." *See Hurd v. Iowa Dep't of Human Servs.*, 580 N.W.2d 383, 387-88 (Iowa 1998); *Polk County v. Iowa State Appeal Bd.*, 330 N.W.2d 267, 277 (Iowa 1983).

In this case, the first question is whether Swanson was aggrieved by the final agency action, namely, the imposition of disciplinary sanctions. In my view, Swanson is so aggrieved. It is undisputed that as a result of the disciplinary reports, the department reduced Swanson's level of privileges at the facility. In addition, Swanson was adversely affected in that the existence of disciplinary reports, even if they might not automatically or necessarily extend his confinement, would constitute a stigma that would make his early release less likely.

Swanson's legal interest, therefore, in challenging the department's imposition of discipline was sufficient to confer standing under the IAPA. The standard for determining whether a person is aggrieved under the IAPA is not demanding.

> First, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision . . . . Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specifically and injuriously affected by the decision.

*City of Des Moines v. Pub. Employment Relations Bd.*, 275 N.W.2d 753, 759 (Iowa 1979). I believe that Swanson has met this test.

The State argues that the discipline meted out against Swanson is "therapy" and as a result, Swanson cannot be considered "aggrieved" as a matter of law. There is nothing in the record to suggest that professional medical judgment was brought to bear on any of the disciplinary proceedings against Swanson. The proceedings were adjudications in the sense that they involved application of established principles of conduct to past actions. *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002). The processes invoked under the handbook are akin to prison disciplinary proceedings, where a system of rewards and punishment are established to control behavior. As a result, resort to *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d. 28 (1982), misses the mark.

But the determination that Swanson met the relatively low requirements of "an aggrieved person" under the IAPA is not the end of the inquiry. Even assuming that Swanson was aggrieved, the question remains whether he was entitled to a contested case hearing under the IAPA. *See* Iowa Code § 17A.2(5) (2005) (definition of contested case). That is a

fundamentally different question than whether he was aggrieved by the final agency action.

Swanson appears to claim he was entitled to an evidentiary hearing under the handbook. There is nothing in the handbook, however, that suggests that he is entitled to an evidentiary hearing in connection with disciplinary proceedings. As a result, there is no basis for Swanson's claim that he was afforded the right to an evidentiary hearing by the agency's adoption of a discretionary policy.

Under the IAPA, however, an aggrieved party is entitled to a contested case proceeding if he or she is entitled to an evidentiary hearing by statute or by constitution. *Hurd*, 580 N.W.2d at 388. Swanson does not claim that he was entitled to an evidentiary hearing by statute, and, as a result, his sole remaining argument is that, as a matter of constitutional law, he is entitled to an evidentiary hearing.

Whether due process entitles a person, who is subject to civil confinement under sexual predator statutes, to an evidentiary hearing on disciplinary matters is a question that has not been addressed by the courts. In the case of *Sandin v. Connor*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), however, a divided United States Supreme Court held that placing a prisoner in solitary confinement as a result of a disciplinary proceeding did not give rise to a liberty interest sufficient to trigger due process protections. The majority held that the change in privileges was insufficient to give rise to a liberty interest. The court further concluded that the mere fact that the disciplinary proceedings might be a factor in the discretionary decision to release the prisoner on parole was too attenuated to give rise to due process protections. *Id.* at 487, 115 S. Ct. at 2302, 132 L. Ed. 2d at 432. Four justices dissented in *Sandin*, noting, among other

things, that the stigma associated with the disciplinary proceedings was sufficient to give rise to a liberty interest.

The *Sandin* case is not directly applicable, however, as this case presents a civil commitment rather than a penal context. Nonetheless, based on *Sandin*, I conclude that the United States Supreme Court would reject any claim that the reduction in privileges experienced by Swanson as a result of the disciplinary proceedings in the civil commitment context gives rise to a liberty interest protected by due process. The question of whether the *stigma* that arises from the disciplinary proceedings is sufficient under the facts and circumstances of this case to give rise to a liberty interest is a somewhat closer question. It is undisputed that a person confined as a result of Iowa's sexual predator statute, unlike the prisoner in *Sandin,* does not have a specific release date. But does this clear distinction make the stigma of discipline in this case even more powerful than that in *Sandin*?

In light of the strong language of the majority opinion in *Sandin,* however, I conclude that if the matter were presented to the United States Supreme Court today, the court would hold that the mere stigma associated with disciplinary proceedings is insufficient to give rise to a liberty interest and therefore does not form the basis for a contested case proceeding. Swanson has not argued that the interpretation of the due process clause under the Iowa Constitution should be approached differently and, as a result, we treat its proper interpretation as identical with its federal counterpart. *Pfister v. Iowa Dist. Ct.*, 688 N.W.2d 790, 795 (Iowa 2004). Therefore, Swanson loses on the central question he has presented on appeal—whether he was entitled to a contested case proceeding before the agency.

In this case, Swanson did not claim that he was entitled to judicial review of "other agency action" under the IAPA. The language in the majority opinion implying that Swanson was not sufficiently aggrieved under the IAPA to invoke review of "other agency action" is, in my view, incorrect and, in any event, is not necessary to the outcome of this case.