# IN THE SUPREME COURT OF IOWA

No. 22–1521

Submitted October 11, 2023—Filed January 19, 2024

IN RE DETENTION OF STEWART FRANKLIN SCHUMAN,

STATE OF IOWA,
        Appellant,

---

Appeal from the Iowa District Court for Story County, James C. Ellefson, Judge.

The State challenges a district court order granting a sexually violent predator's request for transitional release. **PETITION FOR WRIT OF CERTIORARI GRANTED; WRIT SUSTAINED.**

Waterman, J., delivered the opinion of the court, in which all justices joined except Mansfield, J., who filed an opinion concurring in part and dissenting in part.

Brenna Bird, Attorney General, and Linda J. Hines (argued) and Keisha F. Crestinger, Assistant Attorneys General, for appellant.

Michael H. Adams (argued), Local Public Defender, Special Defense Unit, Des Moines, for appellee.

**WATERMAN, Justice.**

This case presents questions of whether the district court erred by ordering the placement of a sexually violent predator in a transitional release program over the State's objection and the proper form of appellate review. The State argues the offender was ineligible for that program without a relapse prevention plan (RPP) accepted by his treatment provider at the Civil Commitment Unit for Sexual Offenders (CCUSO) as required by Iowa Code section 229A.8A(2)(*d*) (2022). The district court determined that the offender's plan, approved by the offender's expert, satisfied that statutory requirement. The State appealed, and the offender moved to dismiss the appeal for lack of appellate jurisdiction on the grounds that there was no final judgment. The State resisted, and in the alternative, argued that the order could be reviewed through a petition for writ of certiorari under Iowa Rules of Appellate Procedure 6.107 and 6.108. We submitted the motion to dismiss with the appeal.

On our review, we determine that a writ of certiorari is the proper form of appellate review, and we grant the petition. On the merits, for the reasons explained below, we hold that the district court erred by substituting its judgment for that of CCUSO's staff. We agree with the State that this offender was ineligible for placement in the transitional release program because his treatment provider at CCUSO had not accepted his proposed RPP. Acceptance was withheld for a valid reason—the offender's demotion to a more restrictive treatment phase after failing polygraph and penile plethysmograph tests. This offender was not seeking discharge, and courts must give deference to CCUSO's internal placement decisions. The district court erred by second-guessing the CCUSO staff's placement decision. The offender's substantive due process claims fail. We therefore sustain the writ and vacate the district court's ruling.

## I. Background Facts and Proceedings.

Stewart Schuman, now age 69, was civilly committed as a sexually violent predator under Iowa Code chapter 229A in December 2012. A unanimous jury determined that Schuman had been convicted of a sexually violent offense and "suffers from a mental abnormality which makes [him] likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility."[1] Iowa Code § 229A.2(11) (2012). Schuman has been confined at CCUSO within the Cherokee Mental Health Institute since 2012.

**A. Schuman's History of Offending.** Schuman had a troubled upbringing in Louisiana. At age five, Schuman entered foster care. At age 10, Schuman was placed at a Louisiana state training school where he spent the rest of his teenage years and where he was sexually abused by staff and older students. He "began sexually acting out" and sexually abusing his classmates—both boys and girls. Schuman completed the eleventh grade at the training school. He moved to Iowa and obtained his GED in 2005 while incarcerated at the Mount Pleasant Correctional Facility. He has been married twice and has a daughter, a stepdaughter, and a son.

Schuman's criminal record includes two sexual convictions. In 1995, at age 28, he was convicted of third-degree sexual abuse of his seven-year-old son. In 2005, at age 38, he was convicted of third-degree sexual abuse of his six-year-old nephew. Schuman has admitted to other sex offenses that he was not arrested for but has been inconsistent as to how many. In a 2013 polygraph interview, Schuman admitted to over one hundred victims. But in 2016, he admitted to only thirty victims. And in his most recent RPP, Schuman admitted to only seven victims—his seven-year-old son, his six-year-old nephew, an

---

[1]Schuman was diagnosed with pedophilic disorder, antisocial personality disorder, alcohol dependence, polysubstance abuse, and borderline intellectual functioning.

eight-year-old girl in 1977, his nine-year-old stepsister in 1981, an eleven-year-old girl in the early 1980s, and a thirteen-year-old boy and a four-year-old girl at times Schuman could not recall.

**B. The CCUSO Program.** Schuman has participated in the sex offender treatment program (SOTP) at CCUSO for a decade. The Iowa Department of Health and Human Services (HHS) operates CCUSO. Iowa Dep't of Health & Hum. Servs., *Civil Commitment Unit for Sexual Offenders*, https://hhs.iowa.gov/programs/mental-health/find-service/inpatient-facilities/ccuso [https://perma.cc/SG8M-SJ9E] [hereinafter HHS, *CCUSO*]. The legislature established CCUSO through the 1998 Sexually Violent Predators Act of Iowa, 1998 Iowa Acts ch. 1171 (codified at Iowa Code chapter 229A (1999)), which mirrors other states' sexually violent predator programs. *See In re Det. of Garren*, 620 N.W.2d 275, 284 (Iowa 2000) (en banc) (describing the Act as "plainly of a kind" with other states' civil commitment statutes); *see also* HHS, *CCUSO* ("There are twenty (20) states with inpatient treatment programs like CCUSO.").

Chapter 229A was enacted to provide "long-term care and treatment" of a "small but extremely dangerous group of sexually violent predators." Iowa Code § 229A.1(1), (4) (2022). The legislative findings include the necessity for commitment procedures "to protect the public, to respect the needs of the victims of sexually violent offenses, and to encourage full, meaningful participation of sexually violent predators in treatment programs." *Id.* § 229A.1(4). CCUSO provides a mandatory program for sexual offenders considered likely to reoffend, with treatment as the program's main objective. *Swanson v. Civ. Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 302 (Iowa 2007). CCUSO staff includes psychiatric security specialists and therapists who treat the offenders housed there. *See* HHS, *CCUSO*.

"CCUSO developed a 'Patient Handbook and Orientation Manual' [that] provides the rules and policies of CCUSO." *Swanson*, 737 N.W.2d at 302. The handbook explains CCUSO's "phase system," which was developed to motivate offenders to cooperate in their treatment. *Id.* The treatment program is divided into five phases: (1) treatment engagement and interfering factors, (2) identification of dynamic risk factors and long term vulnerabilities, (3) specific interventions for dynamic risk factors and long term vulnerabilities, (4) maintenance of change, and (5) transitional release. The phases represent the offender's progression through treatment. "Treatment is based on the current best practice of Risk-Need-Responsivity Model (RNR) . . . ." HHS, *CCUSO*. A treatment team determines whether the offender has met the requirements for the next phase and then refers the offender to the clinical team for a decision.

Each offender starts at phase one, which is designed to identify treatment-interfering factors. Phase one is called the "assessment and observation phase," when "patients and program staff have an opportunity to become acquainted and to develop a clear understanding about program expectations and rules." *Swanson*, 737 N.W.2d at 302.

Phase two is the "core phase." *Id.* at 303. The offender "participates in a minimum one-year curriculum of psycho-educational groups" that "teach concepts and skills that are fundamental to learning to control sexual impulses." *Id.* Phase two involves the offender recognizing and developing insight into their offense cycle.

Phase three is the "advanced phase." *Id.* This phase requires the offender to "work on applying the principles and concepts learned in phase two." *Id.* The offender is required to develop "an individualized treatment plan" and complete "victim sheets and victim letters." *Id.* The offender also develops specific interventions to control the offender's dynamic risk factors (DRFs)—which are

factors that contribute to the offender's risk of reoffending. There are several other requirements for the offender to advance out of phase three: "no ratings lower than five on the last ninety-day review," no "major behavioral reports for the last four months," and "completion of specific offense polygraphs." *Id.*

Phase four is the "honor phase." *Id.* The offender practices interventions in daily activities. The offender creates an RPP during this phase that outlines the individual's DRFs, interventions for the DRFs, and other ways to lower their risk of reoffending. The offender should learn how to self-identify sexual tendencies and what factors might lead the offender to reoffend. The offender must also successfully complete "a polygraph exam regarding recent sexual fantasies and behaviors." *Id.* At the end of phase four, the offender should be ready for a less restrictive environment with a reduced risk of reoffending. *Id.* Progress from phase four to phase five depends upon the individual satisfying the ten requirements set forth in Iowa Code section 229A.8A(2) and (4). *See id.* We quote those requirements in full in our statutory analysis below.

Phase five is the "transition phase," also known as the transitional release program. *Id.* HHS is authorized to "provide control, care, and treatment, and supervision of committed persons placed in [the transitional release] program." Iowa Code § 229A.8A(1). HHS is also "responsible for establishing and implementing the rules and directives regarding the . . . restrictions on confinement and the movement of committed persons, and for assessing the progress of committed persons in the program." *Id.* § 229A.8A(6).

In phase five, the offender "is gradually given increasing opportunities to live in less restrictive settings." *Swanson*, 737 N.W.2d at 303. Offenders take on more responsibility for their own care, and CCUSO staff closely monitors them to determine whether they should be recommended for final release. Phase five provides the offender with a controlled and monitored introduction into the

community outside of confinement at CCUSO. Each public outing must be approved by CCUSO staff. Outings are closely monitored at first but become less so as the offender shows reliability.

The CCUSO program also has treatment levels within each phase. *See id.* at 304. Each level provides rewards and privileges for offenders who avoid behavioral problems and suspensions. *See id.* Offenders progress through different levels of each phase to receive more privileges before moving on to the next phase. *Id.* Rule violations may result in demotions to a lower level or phase and loss of privileges. *Id.*

**C. Schuman's Progress at CCUSO.** After 2012, Schuman gradually progressed through the treatment program, reaching phase four, level five in 2018. But he plateaued there for about four years. During this time, Schuman developed several RPPs; none were approved. CCUSO staff subjected Schuman to at least fifteen polygraphs between 2012 and 2020; he passed fourteen and failed one. In 2021, Schuman was subjected to two maintenance polygraphs and two penile plethysmographs (PPGs).[2]

The first PPG was administered to Schuman in July 2021. The results were uninterpretable because Schuman did not meet the minimum threshold of arousal for any segments. He did show signs of possible response interference on one segment: "female prepubescent coercive."

---

[2]A PPG is a procedure that "involves placing a pressure-sensitive device around a man's penis, presenting him with an array of sexually stimulating images, and determining his level of sexual attraction by measuring minute changes in his erectile responses." *United States v. Rhodes*, 552 F.3d 624, 626 (7th Cir. 2009) (quoting Jason R. Odeshoo, *Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders*, 14 Temp. Pol. & C.R. L. Rev. 1, 2 (2004)). PPGs are "rather routine in adult sexual offender treatment programs." *Id.* (quoting *United States v. Weber*, 451 F.3d 552, 562 (9th Cir. 2006)). Experts disagree about their use and effectiveness. *Id.* at 626–27.

The second PPG was administered in August 2021. This time Schuman reached clinical significance on the same segment. There were also signs of possible response interference on another segment: "male prepubescent coercive." The report prepared by the test's administer stated that "Schuman was angry during the majority of the test and talked during some of the segments, which required prompting him to stop." The report disclosed that Schuman's age preference score indicated he was more aroused by images of children than adults and concluded that he "falls within the high range of risk, indicating he has a high degree of sexual motivation in committing offense behaviors."

A polygraph was administered to Schuman in March 2021. The polygrapher conducted a pretest interview that asked him three questions:

> 1) Since your last test, did you penetrate your anus with your fingers for sexual pleasure, 2) Since your last test, did you stick any kind of food into your anus, and 3) Since your last test, did you enter your anus with any inanimate object?

Schuman answered no to each question. The test results indicated Schuman had a significant response to question one, so the polygrapher labeled his response "untruthful." Schuman failed the polygraph.

Another polygraph was administered to Schuman in September. The polygrapher again conducted a pretest interview, this time asking about masturbation. Schuman answered that he had masturbated using a homemade dildo, but "didn't get nothing." During the polygraph, the polygrapher asked Schuman another three questions: 1) "Since your last test, other than that one time that you said, did you masturbate your bare penis?" 2) "Since your last test, did you masturbate your bare penis while watching any images directly aimed at minors?" 3) "Since your last test, besides that one time you disclosed, did you penetrate your anus for any sexual pleasure?" Schuman answered no to each question. Schuman had a significant response to the first question, and the

polygrapher labeled his response "untruthful." Thus, Schuman also failed this polygraph. Because of these failed polygraph examinations, CCUSO staff demoted Schuman from phase four, level five to phase three, level four.

**D. Schuman's Annual Review Hearing in 2022.** On February 21, 2022, Schuman requested an annual review hearing under Iowa Code section 229A.8.[3] Schuman bore the burden of proving "by a preponderance of the evidence that there is relevant and reliable evidence to rebut the presumption of continued commitment, which would lead a reasonable person to believe a final hearing should be held to determine either of the following:" discharge or placement in transitional release. *Id.* § 229A.8(5)(*e*)(1). Schuman submitted a report by Dr. Luis Rosell to the district court stating that Schuman was suitable for full discharge and placement in the transitional release program. The annual review hearing was held telephonically on March 21. Schuman argued that given the "extremely low burden placed on" him and the report of Dr. Rosell, a final hearing should be set. The State conceded that Dr. Rosell's report "does meet [Schuman's] burden" to receive a final hearing. That same day, the district court ordered a final hearing because it found, based on the report from Dr. Rosell and the State's concession, Schuman met his burden to set a final hearing. The final hearing was set for June 30 but was continued to July 6 for good cause.

**E. Schuman's Final Review Hearing.** The final hearing was conducted by videoconference on July 6. Instead of requesting discharge, Schuman lowered his sights to seek placement in a transitional release program. The State had the burden of showing beyond a reasonable doubt that Schuman was not suitable

---

[3]Each offender is "entitled to an annual review to determine whether the person's circumstances have sufficiently changed to warrant a final hearing for the court to determine if the committed person should be discharged or is suitable for placement in a transitional release program." *Taft v. Iowa Dist. Ct.* (*Taft II*), 879 NW.2d 634, 635 (Iowa 2016).

for that placement. Three witnesses testified: Schuman; the State's expert, Dr. Anna Salter; and Schuman's expert, Dr. Rosell.

Schuman testified that he had been demoted for about six months due to his failed polygraphs. Schuman testified that the first polygraph report was incorrect and that he did not penetrate his anus with his fingers. As to his second failed polygraph, Schuman claimed that he "made up a story" to tell the polygrapher in the pretest interview and chose to lie because "if I failed the polygraph, I was going to lose my Phase [Four] and Level [Five]." Schuman acknowledged that he is still attracted to boys and girls ages six to fourteen.

Schuman testified that he had created "four or five relapse prevention plans," but did not know if his CCUSO therapist read them and did not hear anything back about them. Schuman explained that he created a new RPP while in phase three and submitted it to his therapist, who took no action on the plan. Schuman explained that he sought transitional release "to get a job" and "build some money up" before being discharged.

Dr. Salter, a psychologist, testified regarding her experience evaluating sex offenders since the early 1980s. She has served as the civil commitment evaluator for the State since 2004 and has conducted approximately 400 progress evaluations for sex offenders. She has undergone specialized training in "all the current risk assessment tools," and has served as a "trainer in scoring a Static-99."[4]

---

[4]Static-99 is an "actuarial risk assessment instrument[]" used to "observe the number of pre-defined risk factors that an offender demonstrates, and estimate the likelihood that an offender with a certain number of the pre-defined risk factors will recidivate." Marcus T. Boccaccini & Daniel C. Murrie, *Field Validity of the Static-99 and MnSOST-R Among Sex Offenders Evaluated for Civil Commitment as Sexually Violent Predators*, 15 Psych. Pub. Pol'y & L. 278, 278–79 (2009).

Dr. Salter testified that Schuman did not and should not qualify for transitional release based on his failed polygraphs. She opined that his failures raise issues about his transparency and honesty—"if you're willing to lie about what you're seeing and thinking and experiencing and feeling and the urges you have, there isn't any way to successfully monitor the person." Dr. Salter explained why Schuman had been in phase four for four years:

> Well, the closest documentation that I have is the DRF summary by the therapist who's had him for the last two years. Now, since he wasn't promoted for four years, there was a previous therapist for two years who also thought that he was not ready for transition.
>
> And what they have said is that he has not -- even though he will admit that he's a pedophile, he is unable in group to explain how he can reduce his pedophilic thoughts. He repeatedly comes back to the fact that he can't get an erection so therefore he's not going to molest children, even though there's significant numbers of child molesters and rapists who cannot get an erection and, nonetheless, molest kids.
>
> They talk about his lack of transparency. They talk about his insufficient . . . RPP. This is not just one person. This is two therapists in a row and an entire treatment team who feel that he did not ever meet the requirements to get his RPP approved . . . . I don't think that the treatment team sort of unfairly refuses to approve RPPs when they are solid and comprehensive.

Next, Dr. Salter addressed why Schuman did not have an approved RPP:

> Now, when I read the records[,] it doesn't appear to me that . . . they think he has sufficient interventions to begin with[,] . . . he needs more; but in any case, even if he had sufficient interventions, he needs to practice them for a year. Not lying to progress in treatment would be a red flag because if . . . you openly state, "I'm willing to lie to progress in treatment," it means that the transparency that people need in order to assess your progress just isn't there. They're going to say what I think you want to hear, and that's a very -- that is not a Phase 4 kind of behavior.

Dr. Salter then described why it is a good policy for offenders to complete phase four before getting an RPP approved:

I think you need to develop an adequate number of interventions and I think you need to demonstrate that if you have a lapse or you have a problem, you're going to be transparent about it and get help. I think you need to demonstrate that you can live the interventions.

. . . People who refuse to journal, the therapists are completely blind about how many urges they're having, how often they're having them and how they're handling them, how they're thinking about them, what they're doing about them.

And if you combine that kind of blindness with someone who, for at least the last two years, never mentions or at least does not discuss in any depth their arousal to inflicting pain or their arousal to children, then you have someone who is -- in their opinion is not appropriate for Phase 4.

Schuman's expert, Dr. Rosell, described his experience as a psychologist in correctional facilities before becoming the director of the SOTP in the Mount Pleasant Correctional Facility from 1998 to 2002. Since then, he has been conducting sex offender evaluations "on a regular basis."

Dr. Rosell disagreed with Dr. Salter on the significance of Schuman's failed polygraphs. Dr. Rosell thought it was more telling that Schuman admitted to lying, which shows he is "open and honest." Dr. Rosell also disagreed with Dr. Salter's assessment of Schuman's latest RPP: "I believe it has been developed. It just hasn't been accepted. I believe it's worthy of acceptance. I'm not privy to the reasons why it hasn't been accepted but, you know, that seems to be the sticking point in his progression." Dr. Rosell added that Schuman's RPP has "a nice outline" that lists the factors and the interventions and "goes through everything as you're supposed to. And I've reviewed many [RPPS], and this covers all the areas that he needs for the future." Finally, Dr. Rosell testified that Schuman should be placed in transitional release.

The district court entered its ruling on August 17. The district court ordered Schuman's placement in the transitional release program. The district court analyzed all ten requirements for transitional release in section 229A.8A,

and it found that the State failed to "prove beyond a reasonable doubt" that Schuman was "not suitable for placement in a transitional release program." The district court gave "no weight to the polygraph results" because the record showed "nothing about the polygrapher except that the polygrapher is relatively new" and "reveals nothing about . . . either the polygrapher's methods or qualifications." The district court discredited the PPG results because "the State has not sought to establish the qualifications of the [PPG] operator or the reliability of the operator's methods. . . . [T]his court, acting as the finder of fact, considers that on this specific record the PPG is of little to no value."

The State appealed, arguing that the district court erred by placing Schuman in the transitional release program. Specifically, the State challenges the district court's finding that the RPP requirement has been satisfied. Schuman responds that the district court correctly determined that his RPP was adequate, and that he satisfied the statutory requirements to be placed in the transitional release program. Alternatively, Schuman argues that his substantive due process rights would be violated by allowing the State to "veto" his RRP and limit eligibility for transitional release to those in phase four.

## II. Proper Form of Review.

Before reaching the merits of the appeal, "we must first determine whether we have the authority to decide the appeal." *Christiansen v. Iowa Bd. of Educ. Exam'rs*, 831 N.W.2d 179, 186 (Iowa 2013). After the State filed a notice of appeal, Schuman moved to dismiss the appeal for lack of appellate jurisdiction on the grounds that there was no final judgment. The State resisted, arguing that the "[c]ourt has considered direct appeals in other cases in which transitional release or discharge have been denied or granted following a final hearing." Alternatively, the State argues that we could review the district court

ruling by a writ of certiorari under Iowa Rules of Appellate Procedure 6.107 and 6.108. We ordered Schuman's motion to dismiss to be submitted with the appeal.

In its appellate brief, the State argues that the district court's order placing Schuman in transitional release following a final hearing was a final determination by the district court that is directly appealable. But at oral argument, the State conceded that the district court's order is not a final decision because the district court has continuing jurisdiction over the individual until final discharge.

Iowa Code section 229A.8 governs the annual review process and requires an offender to have an examination conducted every year. An annual report must be submitted to the district court "that committed the person under this chapter." *Id.* § 229A.8(3). The district court determines whether the individual's commitment should be continued. *Id.* § 229A.8(5)(*e*)(1). Applying a similar statute, the Washington Supreme Court held that offenders are under the trial court's "continuing jurisdiction" until their "unconditioned release," and there is no final judgment until nothing is left "for the court to do but execute the judgment." *In re Det. of Petersen*, 980 P.2d 1204, 1213–14 (Wash. 1999) (en banc) (quoting *Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 901 P.2d 1060, 1062 (Wash. Ct. App. 1995)); *see also Gaal v. Iowa Dist. Ct.*, No. 01–0321, 2002 WL 31113863, at *1 (Iowa Ct. App. Sept. 25, 2002) (en banc) (finding *In re Detention of Peterson* persuasive and holding that a ruling denying a final hearing under Iowa Code section 229A.8 is not a final order subject to direct appeal but rather is reviewable by a petition for writ of certiorari). We reach the same conclusion and hold that the district court's ruling placing Schuman in transitional release is not a final decision appealable as of right.

Next, we must decide the proper procedure for review of the district court ruling. Under Iowa Rule of Appellate Procedure 6.108, if another form of review

is the proper form, then "the case shall not be dismissed, but shall proceed as though the proper form of review had been requested." At oral argument, the State argued—and Schuman's counsel agreed—that we should treat the appeal as a petition for writ of certiorari. A petition for writ of certiorari is appropriate when a party claims the district court "exceeded [its] jurisdiction or otherwise acted illegally." *Id.* r. 6.107(1). We hold certiorari is the proper method to review the order for transitional release. We consider the State's notice of appeal as a petition for a writ of certiorari and grant the petition.

**III. Standard of Review.**

"We review certiorari actions for correction of errors at law." *Taft v. Iowa Dist. Ct.* (*Taft II*), 879 N.W.2d 634, 638 (Iowa 2016) (quoting *Taft v. Iowa Dist. Ct.* (*Taft I*), 828 N.W.2d 309, 312 (Iowa 2013)). "We examine the court's jurisdiction and the legality of its actions, including the proper application of law and evidentiary support for factual findings." *Id.* We review the district court's interpretation of chapter 229A for correction of errors at law. *In re Det. of Betsworth*, 711 N.W.2d 280, 283 (Iowa 2006).

"We review constitutional challenges de novo." *Taft II*, 879 N.W.2d at 638 (quoting *In re Det. of Matlock*, 860 N.W.2d 898, 901 (Iowa 2015)).

> [W]e must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because [he] must prove the unconstitutionality beyond a reasonable doubt. Moreover, "the challenger must refute every reasonable basis upon which the statute could be found to be constitutional." Furthermore, if the statute is capable of being construed in more than one manner, one of which is constitutional, we must adopt that construction.

*State v. Hess*, 983 N.W.2d 279, 284 (Iowa 2022) (alterations in original) (quoting *State v. Aschbrenner*, 926 N.W.2d 240, 246 (Iowa 2019)).

**IV. Analysis.**

We first address whether the district court erred by construing Iowa Code section 229A.8A(2)(*d*) to allow judicial approval of Schuman's RPP based on its own judgment and Schuman's expert but without the approval of Schuman's treatment provider. We hold that the district court overstepped its bounds because Schuman was statutorily ineligible for placement in the transitional release program without an RPP accepted by his CCUSO treatment provider.

Next, we address Schuman's substantive due process claims, and we reject them. There is no showing in the record that the State acted arbitrarily or in bad faith by withholding approval of Schuman's RPP or in demoting him to phase three. Courts owe deference to the treatment decisions of CCUSO staff. Schuman was not seeking a discharge, and his limited liberty interest in potential transitional release on this record does not override the State's interest in protecting the public from sexually violent predators.

**A. The District Court Erred by Substituting Its Judgment for the Treatment Provider Who Never Accepted Schuman's RPP.** The district court concluded that the State failed to prove Schuman was ineligible for transitional release. The fighting issue is the statutory requirement that a "detailed relapse prevention plan has been developed and *accepted by the treatment provider.*" Iowa Code § 229A.8A(2)(*d*) (emphasis added). It is undisputed that Schuman's treatment provider—the CCUSO staff—never accepted his RPP. The district court nevertheless deemed this requirement satisfied based on its own determination and the testimony of Schuman's expert that Schuman's RPP "cover[ed] the necessary areas" and his treatment work was "comprehensive and detailed." The State argues that the district court erred in disregarding the statute's plain language requiring the *treatment provider*'s acceptance of the RPP. Schuman

counters that we should construe the statute to allow the district court to decide "whether the plan met the legislative requirements." We agree with the State.

1. *Overview of transitional release.* Section 229A.8 governs transitional release. This statute establishes "a rebuttable presumption . . . that the commitment should continue" for the offender. Iowa Code § 229A.8(1). The offender is entitled to "have a current examination of [the offender's] mental abnormality made once every year." *Id.* § 229A.8(2). This examination is made in a report to the district court. *Id.* § 229A.8(3). The offender then has a right to an "annual review" for the district court to determine if the offender's commitment should continue. *Id.* At the annual review, the offender may petition for "discharge or placement in a transitional release program." *Id.* § 229A.8(4). The department must provide the offender with a written notice each year of the "right to petition the court for discharge or placement in a transitional release program without authorization from the director." *Id.* The offender may request a hearing for annual review within thirty days of the annual review notice. *Id.* § 229A.8(5)(*d*).

> At the annual review hearing, the offender carries the burden of proof.
>
> [The offender must] prove by a preponderance of the evidence that there is relevant and reliable evidence to rebut the presumption of continued commitment, which would lead a reasonable person to believe a final hearing should be held to determine either of the following:
>
> > (*a*) The mental abnormality of the committed person has so changed that the person is not likely to engage in predatory acts constituting sexually violent offenses if discharged.
> >
> > (*b*) The committed person is suitable for placement in a transitional release program pursuant to section 229A.8A.

*Id.* § 229A.8(5)(*e*)(1). The court must set a final hearing if the court determines the offender met his or her burden under paragraph (*a*) or (*b*), or both. *Id.*

§ 229A.8(5)(*e*)(2)(*a*). At the final hearing, the state bears the burden to prove beyond a reasonable doubt that either the individual's "mental abnormality remains such that the person is likely to engage in predatory acts that constitute sexually violent offenses if discharged" or the individual "is not suitable for placement in a transitional release program pursuant to section 229A.8A." *Id.* § 229A.8(6)(*d*).

Section 229A.8A governs the requirements for transitional release. The statute provides ten requirements that all must be met to qualify for transitional release:

> 2. A committed person is suitable for placement in the transitional release program if the court finds that all of the following apply:
>
> *a.* The committed person's mental abnormality is no longer such that the person is a high risk to reoffend.
>
> *b.* The committed person has achieved and demonstrated significant insights into the person's sex offending cycle.
>
> *c.* The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim.
>
> *d. A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history.*
>
> *e.* No major discipline reports have been issued for the committed person for a period of six months.
>
> *f.* The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B.
>
> *g.* The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program.
>
> *h.* The placement is in the best interest of the committed person.
>
> *i.* The committed person has demonstrated a willingness to agree to and abide by all rules of the program.

. . . .

> 4. A committed person who refuses to register as a sex offender is not eligible for placement in a transitional release program.

*Id.* § 229A.8A(2), (4) (emphasis added). Only paragraph (*d*) is contested here.

Several of the eligibility requirements in section 229A.8A(2) involve relatively open-ended fact-finding by the district court. For example, section 229A.8A(2)(*a*) requires the district court to determine whether "[t]he committed person's mental abnormality is no longer such that the person is a high risk to reoffend." *Id.* § 229A.8A(2)(*a*). Other requirements in section 229A.8A(2), however, only require the court to answer questions of historical fact. For example, subsection (2)(*e*) requires the court to determine whether "[n]o major discipline reports have been issued for the committed person for a period of six months." *Id.* § 229A.8A(2)(*e*); *see also Taft I*, 828 N.W.2d at 321–22 (affirming denial of transitional release due to major disciplinary violations).

2. *Analysis of Iowa Code section 229A.8A(2)(*d*).* Under its plain language, an offender is ineligible for transitional release without an RPP accepted by the treatment provider. *Id.* § 229A.8A(2)(*d*). Whether the offender's treatment provider accepted the RPP is a historical fact. It either happened or it did not. The record in this case is clear: No treatment provider accepted Schuman's RPP. Schuman nevertheless argues the district court could approve the RPP through its own judicial determination. The State argues the statute requires acceptance of the RPP *by the treatment provider*, without which Schuman is not "suitable for placement in the transitional release program." The State further argues that the district court lacks statutory authority to approve an RPP that the treatment provider never accepted. We agree with the State.

The legislature specifically granted the "treatment provider" the sole authority to accept the RPP. Iowa Code § 229A.8A(2)(*d*). The legislature did not define "treatment provider" in chapter 229A, but both parties acknowledge that the treatment provider is Schuman's current therapist at CCUSO. Schuman's RPP includes a space for his therapist to sign and approve it. Our own contextual analysis confirms that the "treatment provider" is within CCUSO. Section 229A.7(7) provides the "control, care, and treatment" of an offender must be "provided at a facility operated by the department of [health and] human services." *Id.* § 229A.7(7). It also requires an offender under the "control, care, and treatment by the department" to be "kept in a secure facility . . . under the supervision of the department." *Id.* That facility, where Schuman has been confined, is CCUSO. The staff there sign off on whether individual offenders receive "increasing opportunities to live in less restrictive settings." *Swanson*, 737 N.W.2d at 303. And specifically, it is the treatment provider who decides whether the RPP is "appropriate for the committed person's mental abnormality and sex offending history." *See* Iowa Code § 229A.8A(2)(*d*). As the State observes, this makes good policy sense because the CCUSO therapist providing ongoing treatment knows the offender best.

Schuman argues that "[t]he legislature surely did not intend to prohibit judicial examination of the issue or give the treatment program veto power over the district court." He argues that we "can uphold the intent of the legislature by reading the statute to require the district court to hear evidence about the relapse prevention plan and make decisions concerning the completeness and appropriateness as well as the circumstances of the plan as did the district court in this case." We disagree. The plain meaning of section 229A.8A(2)(*d*) authorizes "the treatment provider" alone to accept the RPP, not the court or an outside expert retained by the offender's counsel. Iowa Code § 229A.8A(2)(*d*). "When a

proposed interpretation of a statute would require the court to 'read something into the law that is not apparent from the words chosen by the legislature,' the court will reject it." *State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017) (quoting *State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007)).

Relying on inapposite cases involving statutes unrelated to chapter 229A, our colleague's partial dissent would read into section 229A.8A(2)(*d*) an implied requirement that the treatment provider "consider" the RPP and presumably either accept or reject it "by the time of the final hearing." We decline to read that timing requirement into the statute. CCUSO chose not to consider Schuman's RPP because it determined he was ineligible for transitional release after his demotion to phase three, a decision which we will address in turn.

*Taft I* is instructive on the interplay between CCUSO and the courts. In *Taft I*, we determined the "plain language of section 229A.8A(2)(*e*) disqualifies from transitional release any committed person who has received any major disciplinary report during the previous six months." *Taft I*, 828 N.W.2d at 322. We rejected the argument that the district court could override that requirement based on the testimony of the offender's expert who discounted the significance of those disciplinary violations. *Id.* We reach the same conclusion here. The plain language of section 229A.8A(2)(*d*) disqualifies Schuman from transitional release when he lacks an RPP approved by his CCUSO treatment provider, regardless of the approval of his retained outside expert.

We hold that Schuman was ineligible for transitional release because his RPP was never accepted by his treatment provider at CCUSO. The district court erred by ruling Schuman satisfied the RPP requirement.

**B. The District Court Erred by Overriding CCUSO's Decision to Demote Schuman to Phase Three.** The district court found that Schuman was demoted from phase four to phase three "as a result of failing two maintenance

polygraphs, one in March of 2021 and the other in September of 2021." The district court determined that "the fact that Schuman was reduced to Phase [Three] and RPPS are not accepted until Phase [Four]" was not a "sufficient reason" to reject Schuman's RPP, and "there was no reliable reason for the reduction to Phase [Three]." Contrary to the partial dissent, the district court does not get to override CCUSO's demotion decision and then unilaterally deem the RPP requirement satisfied because it found Schuman's expert more credible than the State's.[5] We hold that the district court erred by substituting its judgment for CCUSO's internal placement decision.

The legislature granted CCUSO broad authority to operate its treatment and transitional release programs. Section 229A.7(7) requires CCUSO to provide the "control, care, and treatment" of the offenders; and the treatment and care must be "provided at a facility operated by the department." Iowa Code § 229A.7(7). The legislature requires CCUSO to "establish a transitional release program and provide control, care, and treatment, and supervision of committed persons placed in such a program." *Id.* § 229A.8A(1). And the legislature empowered CCUSO to "establish[] and implement[] the rules and directives regarding the location of the transitional release program, staffing needs, restrictions on confinement and the movement of committed persons, and for assessing the progress of committed persons in the program." *Id.* § 229A.8A(6).

The legislature codified the purpose of CCUSO's treatment program: "The procedures regarding sexually violent predators should reflect legitimate public

---

[5]The partial dissent relies on substantial evidence review of the district court's findings under the eligibility requirements for transitional release under Iowa Code section 229A.8A(2)(*a*)–(*c*), (*g*)–(*h*). But the fighting issue is paragraph (*d*), the requirement for approval of the RPP by the treatment provider. No substantial evidence supports the district court's finding that paragraph (*d*) was satisfied. Indeed, it is undisputed that the treatment provider did not approve Schuman's RPP.

safety concerns, while providing treatment services designed to benefit sexually violent predators who are civilly committed" and "encourage full, meaningful participation" of offenders in the treatment program. *Id.* § 229A.1(4). The legislature granted CCUSO substantial discretion to determine the treatment provided to the offenders and to assess the treatment progress of offenders. Judicial review is limited. *See Swanson*, 737 N.W.2d at 307 (holding a sexually violent predator could not challenge CCUSO's placement decision as an "aggrieved person" under Iowa Code chapter 17A and concluding his failure to progress "is not an adverse action, but an integral part of the treatment under a cognitive-behavioral model"); *see also In re Saiz*, 492 P.3d 484, 491–92 (Kan. Ct. App. 2021) (requiring the district court to "give due regard to the judgment of mental health professionals about the appropriate treatment methods," and reversing the order that released the sexually violent predator).

We have already recognized that correctional officials may rely on a failed polygraph examination as a factor influencing the decision to remove an inmate from a sex offender treatment program. *Reilly v. Iowa Dist. Ct.*, 783 N.W.2d 490, 498–99 (Iowa 2010) ("[P]olygraph examinations serve a rehabilitative purpose within treatment."). We approvingly noted "the use of polygraphs in sex offender treatment programs," including CCUSO. *Id.* (collecting cases); *see also Swanson*, 737 N.W.2d at 303 (discussing the use of polygraphs in the SOTP at CCUSO). And Schuman admittedly lied during his polygraph interview to improve his chances of progressing. As the State's expert, Dr. Salter, testified, lying during a polygraph examination is a red flag that supports Schuman's demotion to the more restrictive phase three. That demotion was "based on . . . the professional judgment of those treating him within the CCUSO program." *Taft II*, 879 N.W.2d at 639.

Courts should give CCUSO's internal placement decisions a "wide berth." *Off. of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 14 (Iowa 2012) (quoting *Citizens' Aide/Ombudsman v. Grossheim*, 498 N.W.2d 405, 407 (Iowa 1993)). "There is a 'presumption of regularity that attaches to the decisions of administrative agencies' that protects them against inquiry into how they reach their decisions based upon mere suspicion." *Id.* at 21 (quoting *Martin Marietta Materials, Inc. v. Dallas County*, 675 N.W.2d 544, 554 (Iowa 2004)). This presumption can be overcome by a "strong showing of bad faith or improper behavior." *Id.* (quoting *Martin Marietta Materials*, 675 N.W.2d at 554). Schuman made no such showing. The district court erred by overruling CCUSO's decision to demote Schuman to phase three.

**C. Schuman's Substantive Due Process Claims Fail.** Schuman argues that requiring "treatment provider approval of a relapse prevention plan amounts to a 'veto' of the district court's exercise of discretion, authority, and options," and thereby violates his substantive due process rights under both the United States and Iowa Constitutions. Shuman further argues that CCUSO's policy "that provides that the relapse prevention plan won't be considered until Phase [Four], likewise violates [his] right to due process." The State responds that Schuman has no substantive due process right to "placement in a different phase of treatment," as opposed to discharge. We agree with the State that CCUSO's denial of transitional release did not violate Schuman's substantive due process rights.

1. *Substantive due process requirements.* "We have 'traditionally considered the federal and state due process provisions to be equal in scope, import, and purpose.'" *Matlock*, 860 N.W.2d at 903 (quoting *Garren*, 620 N.W.2d

at 284).[6] Schuman "does not offer or suggest a framework under the Iowa Constitution different from that under the United States Constitution." *Id.* Accordingly, we apply the same analysis to his state and federal claims. *Id.*

"[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Betsworth*, 711 N.W.2d at 289 (alteration in original) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)). Substantive due process prohibits the State from "engaging in arbitrary or wrongful act[s] 'regardless of the fairness of the procedures used to implement them.'" *Garren*, 620 N.W.2d at 284 (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). "A person's interest in freedom from bodily restraint is 'at the core of the liberty protected by the Due Process Clause from arbitrary governmental actions.'" *Id.* (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).

When confronted with an offender's challenges to treatment decisions, courts "must show deference to the judgment exercised by a qualified professional." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Judges and juries are not "better qualified than appropriate professionals in making such decisions." *Id.* at 322–23. A treatment decision, "if made by a professional, is presumptively valid." *Id.* at 323 (footnote omitted). We will question its constitutionality only when the professional's decision is such "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* "We are not required, nor is it appropriate for us to specify

---

[6]The Fourteenth Amendment to the United States Constitution prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9.

which of several professionally acceptable choices should have been made." *Swanson*, 737 N.W.2d at 309. We are only required "to make certain that professional judgment was in fact exercised." *Id.*

In *In re Detention of Garren*, we rejected the offender's claim that he had a "substantive due process right to the least restrictive setting." 620 N.W.2d at 285. Rather, "substantive due process demands, at the most, that there be a reasonable fit between the governmental purpose and the means chosen to advance that purpose." *Id.* (quoting *In re B.B.*, 516 N.W.2d 874, 879 (Iowa 1994)). We concluded that "there is a reasonable fit here between the State's purpose of protecting society from persons who have been determined to be likely to reoffend if not placed in a secure facility and their placement in such a facility." *Id.*

2. *Substantive due process as applied to Schuman.* Schuman seeks only transitional release—a less restrictive level of treatment—not discharge or supervised release where he would reside outside CCUSO in the community. Discharge is an "unconditional discharge from the sexually violent predator program." Iowa Code § 229A.2(4). Discharge is allowed when the offender "no longer suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses if discharged." *Id.* § 229A.8(1). Supervised release is allowed when the offender still "suffers from a mental abnormality and it is in the best interest of the community to order release with supervision before the committed person is discharged." *Id.* § 229A.9A(1)(*b*). By contrast, the transitional release program allows outings into the community while the offender still remains housed at CCUSO's facility. *See In re Det. of Anderson*, 895 N.W.2d 131, 143 (Iowa 2017).

We reiterate that offenders have no fundamental right to the "least restrictive placement." *Garren*, 620 N.W.2d at 285; *see also Washington v. Bergen* (*In re Det. of Bergen*), 195 P.3d 529, 533–34 (Wash. Ct. App. 2008)

(rejecting a sexually violent predator's substantive due process claim for conditional release into the community as the least restrictive alternative). As Dr. Salter testified, CCUSO staff made a reasoned professional judgment to demote Schuman to phase three and to deny him transitional release without a RPP approved by his therapist who knows him best. Deference is owed to those professional judgments. *See Romeo*, 457 U.S. at 322. The statute that authorized CCUSO's placement decision is "presumed constitutional, and '[t]he challenger bears a heavy burden [to] prove the unconstitutionality beyond a reasonable doubt.' " *Taft II*, 879 N.W.2d at 638 (first alteration in original) (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 233 (Iowa 2002)). Schuman has made no such showing. His substantive due process claims fail.

**V. Disposition.**

For these reasons, we sustain the writ and vacate the district court's ruling.

**PETITION FOR WRIT OF CERTIORARI GRANTED; WRIT SUSTAINED.**

All justices concur except Mansfield, J., who files an opinion concurring in part and dissenting in part.

#22–1521, *In re Detention of Schuman*

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part. I join the majority's conclusion that certiorari is the proper method of reviewing this case. I also agree with the majority that the district court erred in substituting its own evaluation of Stewart Schuman's relapse prevention plan (RPP) for an evaluation by the treatment provider. However, I find the State's conduct problematic in this case, and I would remand for further proceedings on Schuman's request for transitional release.

Schuman's litany of sex offenses with young children might suggest that he is a poor candidate for any type of release. Nonetheless, Schuman completed his prison sentences over a decade ago. He has been civilly confined at the Civil Commitment Unit for Sexual Offenders (CCUSO) since then without the predicate of a criminal conviction. Because of the significant liberty interest at stake, the law requires that Schuman be afforded an annual examination and review. *See* Iowa Code § 229A.8(2) (2022). Concerning that annual review, the law further provides,

> The court shall consider all evidence presented by both parties at the annual review. The burden is on the committed person to prove by a preponderance of the evidence that there is relevant and reliable evidence to rebut the presumption of continued commitment, which would lead a reasonable person to believe a final hearing should be held to determine either of the following:
>
> (*a*) The mental abnormality of the committed person has so changed that the person is not likely to engage in predatory acts constituting sexually violent offenses if discharged.
>
> (*b*) The committed person is suitable for placement in a transitional release program pursuant to section 229A.8A.

> *Id.* § 229A.8(5)(*e*)(1).

On March 21, 2022, the district court held a brief annual review hearing. There, it determined that Schuman should proceed to a final hearing on whether he should be granted discharge or transitional release. As the court explained,

> The Respondent has submitted the report of Dr. Luis Rosell, Psy.D. in which Dr. Rosell opines that the Respondent is suitable for placement in the Transitional Release Program or to be Discharged. The State agrees that this showing satisfies the burden imposed upon the Respondent pursuant to Iowa Code section 229A.8(5)(*e*)(1), and the Court agrees.

Approximately three and a half months later, on July 6, the final hearing took place. At the hearing, three witnesses testified: Schuman, psychologist Dr. Anna Salter for the State, and psychologist Dr. Luis Rosell for Schuman.

Schuman made clear at the final hearing that he was not interested in discharge and only interested in transitional release. Under transitional release, Schuman would continue to be housed at CCUSO but would have opportunities to leave the facility temporarily. Schuman explained why he desired this alternative:

> I want to build some money up. I want to get a job so I can build some money up so I can get me a place to stay. All I got in the bank is a thousand dollars, and I'd like to have more than a thousand dollars to get out in the street.

As the district court put it, "Schuman has specifically disclaimed any request for discharge."

The statute governing transitional release, Iowa Code § 229A.8A, provides,

> 2. A committed person is suitable for placement in the transitional release program if the court finds that all of the following apply:
>
> *a.* The committed person's mental abnormality is no longer such that the person is a high risk to reoffend.
>
> *b.* The committed person has achieved and demonstrated significant insights into the person's sex offending cycle.

*c.* The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim.

*d.* A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history.

*e.* No major discipline reports have been issued for the committed person for a period of six months.

*f.* The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B.

*g.* The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program.

*h.* The placement is in the best interest of the committed person.

*i.* The committed person has demonstrated a willingness to agree to and abide by all rules of the program.

*Id.* § 229A.8A(2).

There was consensus at the final hearing that Schuman met three of these requirements: (*e*), (*f*), and (*i*). The disagreement between Dr. Salter and Dr. Rosell centered on the other criteria. This disagreement played out in the weight that the psychologists placed on Schuman's polygraphs and penile plethysmographs (PPGs) and on the Static-99R risk assessment tool. Dr. Salter took the position that the Static-99R underestimated Schuman's true risk of reoffending and did not use it. Dr. Rosell relied on it.

There was also testimony concerning paragraph (*d*), which requires that "[a] detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history." *Id.* § 229A.8A(2)(*d*). CCUSO is divided into five "phases," with phase five being transitional release and phase four the phase just short of transitional release. Schuman had spent several years in phase four until being demoted in 2021 to phase three because of two failed

polygraphs. While in phase four, Schuman submitted several RPPs, but none were approved. When he was demoted to phase three, Schuman again submitted an RPP. The evidence was undisputed that this RPP was not even considered because CCUSO's policy is not to consider RPPs unless the individual is in phase four. Yet Dr. Rosell testified favorably on this RPP and deemed it "worthy of acceptance":

> Q. Number four, a detailed relapse prevention plan has been developed and accepted by the treatment provider as appropriate for the committed person's abnormality and sex offending history. What is your opinion on that, Doctor?

> A. I believe it has been developed. It just hasn't been accepted. I believe it's worthy of acceptance. I'm not privy to the reasons why it hasn't been accepted but, you know, that seems to be the sticking point in his progression.

For reasons that it explained in detail, the district court generally found Dr. Rosell's testimony more persuasive. It discounted the polygraph and the PPG results. Therefore, the district court concluded that criteria (*a*), (*b*), (*c*), (*g*), and (*h*) had been met. Those are the criteria that the majority characterizes as "open-ended."

The district court's findings on criteria (*a*), (*b*), (*c*), (*g*), and (*h*) are supported by substantial evidence. This means they are binding on us. *See Spitz v. Iowa Dist. Ct.*, 881 N.W.2d 456, 464 (Iowa 2016). Notably, on certiorari review, we must accept the district court's factual findings when they are supported by substantial evidence. *See id.* ("We find error when the district court's finding of facts are not supported by substantial evidence . . . ."). Although the majority quotes Dr. Salter at great length, and quotes Dr. Rosell only briefly, it was Dr. Rosell whom the district court found more credible. Notably, the State does not appeal these findings.

This leaves us only with criterion (*d*), the requirement that the offender have an accepted RPP. Here the district court found:

> A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history. Dr. Salter relies simply on the fact that Schuman was reduced to Phase [Three] and RPPs are not accepted until Phase [Four]. If that was a sufficient reason, the concept of judicial review would be defeated and this trial would have been a waste of time. The court is convinced that there was no reliable reason for the reduction to Phase [Three].

The majority agrees with none of this reasoning; I agree with some of it. If the State and the majority are correct, the trial was indeed "a waste of time." The State consented to a final hearing, which meant that Schuman had rebutted the presumption of continued confinement and presented enough for a reasonable person to conclude a final hearing should be held on whether the offender is suitable for transitional release. But transitional release requires an accepted RPP, and three and half months later the treatment provider hadn't even *looked* at Schuman's RPP. That can't be the end of the story.

For one thing, we interpret statutes like section 229A.8A(2)(*d*) so they make sense, not nonsense. *See* Iowa Code § 4.4(3) ("In enacting a statute, it is presumed that . . . [a] just and reasonable result is intended."). In my view, an implied term of section 229A.8A(2)(*d*)'s requirement that the RPP be *accepted* by the time of the final hearing is a requirement that it be *considered. See Lewis v. Jaeger*, 818 N.W.2d 165, 185 (Iowa 2012) ("[A]lthough a statute employing broad terms is obviously more susceptible to being applied in an arbitrary or discriminatory fashion than one containing detailed language, an ordinance may be narrowed through an implied term of objective reasonableness."); *State v. Abrahamson*, 696 N.W.2d 589, 592 (Iowa 2005) (holding that a statute providing that the court "shall approve" a claim for room and board reimbursement

submitted by a sheriff or county allowed the district court to exercise judgment over that claim and not simply "rubber-stamp" it); *Iowa C.R. Comm'n v. Deere & Co.*, 482 N.W.2d 386, 389 (Iowa 1992) (holding that an agency could not "circumvent [a] statute" establishing a thirty-day time limit for seeking judicial review of no-probable-cause determinations by adopting a rule allowing the agency to reopen a case at any time). The majority justifies the section 229A.8A(2)(*d*) requirement by observing that the CCUSO treatment provider, who must accept the plan, "knows the offender best." But this only works when the treatment provider actually *looks at* the plan.

Second, I believe the majority's analogy to *Taft v. Iowa District Court* is off the mark. *See* 828 N.W.2d 309 (Iowa 2013). In *Taft*, the offender had incurred six major disciplinary reports within the relevant time period. *Id.* at 322. In support of the offender's quest for a final hearing, the offender's expert discounted those reports as "not based on allegations of sexual misconduct." *Id.* This opinion, we held, could not override the "plain language of section 229A.8A(2)(*e*) [that] disqualifies from transitional release any committed person who has received any major disciplinary report during the previous six months." *Id.* Therefore, the offender was not entitled to a final hearing. *Id.* at 323.

This case is different. Section 228A.8A(2)(*d*) is unlike section 228A.8A(2)(*e*) in the extent to which the condition is under the control of CCUSO, rather than the offender. There was no suggestion in *Taft* that the offender had received the disciplinary reports because of something he couldn't do anything about—like CCUSO's refusal even to consider Schuman's RPP. *See id.* at 311 (providing that Taft was cited for "lying to staff," "inciting disruptiveness," "disrespecting the CCUSO staff," and a "boundary violation"). Furthermore, the offender in *Taft* was appealing the court's *denial* of a final hearing, whereas here Schuman was *granted* a final hearing. *Id.* at 312. Under *Taft*, the grant of a final hearing meant

that the offender "more likely than not generated a fact question" on the transitional release issues. *Id.* at 318. Yet now, the majority concludes Schuman was never actually a candidate for transitional release. If so, why did the State agree to the final hearing?

Third, the majority engages in a bit of sleight of hand. It uses Dr. Salter's opinions and the failed polygraphs to justify Schuman's demotion to phase three, which in turn provides the majority's justification for CCUSO's not even having considered Schuman's RPP. But this approach doesn't give adequate weight to the district court's factual findings. The district court didn't accept Dr. Salter's opinions; it found those of Dr. Rosell more credible. In short, the majority reanalyzes the district court's findings on criteria (*a*), (*b*), (*c*), (*g*), and (*h*) to demonstrate that the State didn't act arbitrarily with respect to criterion (*d*). The substantial-evidence rule prohibits the majority from taking this path.

Having said this, I do not agree that the district court itself should have decided the suitability of the RPP on this record. I would remand to give the State an opportunity to supplement the record with testimony from the CCUSO treatment provider on the appropriateness of Schuman's plan. If the CCUSO treatment provider has a nonarbitrary reason for not accepting the plan, then I would hold that Schuman is not entitled to transitional release. If the State declines this opportunity to supplement the record, or the treatment provider cannot articulate a reasonable basis for refusing to accept the plan, then Schuman would enter transitional release. Usually, we don't allow do-overs, but in this case Schuman has less of a liberty interest than usual because he is not seeking outright release, which he recognizes he is not ready for. Schuman does have a legitimate interest in not being subjected to arbitrary government conduct.